# UNITED STATES *v.* FIVE GAMBLING DEVICES ETC.

NO. 14.

Argued October 12, 1953.—Decided December 7, 1953.

*Acting Solicitor General Stern* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Olney, Beatrice Rosenberg* and *Carl H. Imlay. Solicitor General Cummings* was on the Statement as to Jurisdiction in No. 14; *Acting Solicitor General Stern* in Nos. 40 and 41.

*Shelby Myrick* argued the cause and filed a brief for appellees in Nos. 40 and 41. No appearance for appellee in No. 14.

MR. JUSTICE JACKSON announced the judgment of the Court and an opinion in which MR. JUSTICE FRANKFURTER and MR. JUSTICE MINTON join.

These cases present unsuccessful attempts, by two different procedures, to enforce the view of the Department of Justice as to construction of the Act of January 2, 1951,[1] which prohibits shipment of gambling machines in interstate commerce but includes incidental registration and reporting provisions. Two indictments charge Denmark and Braun severally with engaging in the business of dealing in gambling devices without registering with the Attorney General and reporting sales and deliveries. Both indictments were dismissed. The other proceeding is a libel to forfeit five gambling machines seized by Federal Bureau of Investigation agents from a country club in Tennessee. It also was dismissed.

The three cases, here on Government appeals, are similar in features which led to their dismissal and which raise constitutional issues. The indictments do not allege that the accused dealers, since the effective date of the Act or for that matter at any other time, have bought, sold or moved gambling devices in interstate commerce, or that the devices involved in their unreported sales have, since the effective date of the Act or at any other time, moved in interstate commerce or ever would do so. The libel does not show that the country club's machines were at any time transported in or in any way affect interstate commerce.

Section 2 of the Act prohibits transportation of gambling devices in interstate commerce except to any state

---

[1] 64 Stat. 1134, 15 U. S. C. (Supp. V) §§ 1171–1177.

which exempts itself or its subdivision by state law.[2] Section 3 requires every manufacturer and dealer in gambling devices annually to register his business and name and monthly to file detailed information as to each device sold and delivered during the preceding month.[3] Section

[2] In pertinent part: "It shall be unlawful knowingly to transport any gambling device to any place in a State, the District of Columbia, or a possession of the United States from any place outside of such State, the District of Columbia, or possession: *Provided,* That this section shall not apply to transportation of any gambling device to a place in any State which has enacted a law providing for the exemption of such State from the provisions of this section, or to a place in any subdivision of a State if the State in which such subdivision is located has enacted a law providing for the exemption of such subdivision from the provisions of this section. . . ." 64 Stat. 1134, 15 U. S. C. (Supp. V) § 1172.

[3] "Upon first engaging in business, and thereafter on or before the 1st day of July of each year, every manufacturer of and dealer in gambling devices shall register with the Attorney General his name or trade name, the address of his principal place of business, and the addresses of his places of business in such district. On or before the last day of each month every manufacturer of and dealer in gambling devices shall file with the Attorney General an inventory and record of all sales and deliveries of gambling devices as of the close of the preceding calendar month for the place or places of business in the district. The monthly record of sales and deliveries of such gambling devices shall show the mark and number identifying each article together with the name and address of the buyer or consignee thereof and the name and address of the carrier. Duplicate bills or invoices, if complete in the foregoing respects, may be used in filing the record of sales and deliveries. For the purposes of this Act, every manufacturer or dealer shall mark and number each gambling device so that it is individually identifiable. In cases of sale, delivery, or shipment of gambling devices in unassembled form, the manufacturer or dealer shall separately mark and number the components of each gambling device with a common mark and number as if it were an assembled gambling device. It shall be unlawful for any manufacturer or dealer to sell, deliver, or ship any gambling device which is not marked and numbered for identification as herein provided; and it shall be unlawful for any manufacturer or dealer to

6 provides criminal penalties for failure to register or for violation of the transportation section,[4] and § 7 authorizes forfeiture of devices sold in violation of the Act.[5]

The information requirements are not expressly limited to persons engaged or transactions occurring in interstate commerce or conditioned on any connection therewith. Neither does the Act by any specific terms direct its application to transactions such as we have here.

Appellees contend, first, that the Act should not be construed to reach dealers, transactions or machines

manufacture, recondition, repair, sell, deliver, or ship any gambling device without having registered as required by this section, or without filing monthly the required inventories and records of sales and deliveries." 64 Stat. 1135, 15 U. S. C. (Supp. V) § 1173.

[4] "Whoever violates any of the provisions of sections 2, 3, 4, or 5 of this Act shall be fined not more than $5,000 or imprisoned not more than two years, or both." 64 Stat. 1135, 15 U. S. C. (Supp. V) § 1176.

[5] "Any gambling device transported, delivered, shipped, manufactured, reconditioned, repaired, sold, disposed of, received, possessed, or used in violation of the provisions of this Act shall be seized and forfeited to the United States. All provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from the sale thereof; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this Act, insofar as applicable and not inconsistent with the provisions hereof: *Provided,* That such duties as are imposed upon the collector of customs or any other person with respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of gambling devices under this Act by such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General." 64 Stat. 1135, 15 U. S. C. (Supp. V) § 1177.

unless shown to have some relation to interstate commerce; second, construed otherwise, the Act exceeds the power delegated to Congress under the Commerce Clause of the Constitution; third, the statute is unconstitutionally vague.

The Government answers, first, that the statute, literally read, reaches all dealers and transactions and the possession of all unreported devices without reference to interstate commerce; second, to make effective the prohibition of transportation in interstate commerce, Congress may constitutionally require reporting of all intrastate transactions; and, third, while Congress, by oversight, left an inappropriate and confusing phrase in the Act, the defect is not fatal inasmuch as the Attorney General has power to supplement the Act by regulations which will cure its indefiniteness.[6]

---

[6] The ambiguity in the statute arose from the following facts: In the bill originally submitted to the Senate, S. 3357, § 3 began: ". . . every manufacturer of and dealer in gambling devices shall register with the *collector of internal revenue for each district in which such business is to be carried on,* his name [etc.] . . . ." (Emphasis added.) See 96 Cong. Rec. 13649; Hearings before House Committee on Interstate and Foreign Commerce on S. 3357, 81st Cong., 2d Sess. 2. However, the Treasury Department wrote the House committee that since the bill did not concern the collection of revenue, the Justice Department should handle the registration of gambling devices. See H. R. Rep. No. 2769, 81st Cong., 2d Sess. 14; Hearings on S. 3357, *supra,* at 8–9. The House committee therefore deleted from the bill the language italicized above and substituted the words "Attorney General." See H. R. Rep. No. 2769, *supra,* at 8–9; 96 Cong. Rec. 13650, 14735, 15106, 15108, 16701. The deletion left without meaning the phrase "in such district," which appeared later in the section and which had previously referred back to the district in which the business was to be carried on.

The Attorney General attempted to clarify the ambiguity by issuing Department of Justice Order No. 4173, 28 CFR, 1952 Supp., § 3. He claimed authority to issue such a regulation under R. S. § 161, 5 U. S. C. § 22, which reads: "The head of each department is authorized to prescribe regulations, not inconsistent with law, for

We do not intimate any ultimate answer to the appellees' constitutional questions other than to observe that they cannot be dismissed as frivolous, nor as unimportant to the the nature of our federation. No precedent of this Court sustains the power of Congress to enact legislation penalizing failure to report information concerning acts not shown to be in, or mingled with, or found to affect commerce. The course of decision relied on by the Government on analysis falls short of the holding asked of us here. Indeed, we find no instance where Congress has attempted under the commerce power to impose reporting duties under penal sanction which would raise the question posed by these proceedings.[7]  It is apparent

the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it."

[7] Under the liquor law enforcement statutes, the offense was only complete when the unlabeled liquor was shipped in interstate commerce. *E. g.*, 35 Stat. 1137, as amended, 49 Stat. 1930, 18 U. S. C. § 390. See *Blumenthal* v. *United States,* 88 F. 2d 522, 524–525; *Arnold* v. *United States,* 115 F. 2d 523, 524. The marking and labeling section of the Ashurst-Sumners Act, 49 Stat. 494, 18 U. S. C. § 396c, specifically provided that prison-made goods must be marked "when shipped or transported in interstate or foreign commerce." See *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334, 344, 352–353, where a suit for mandatory injunction under the Act alleged that the goods had been delivered in interstate commerce. A similar provision appeared in the subsequent statute. 62 Stat. 786, 18 U. S. C. (Supp. III) § 1762 (a). The Lacey Act of 1900, 31 Stat. 188, required packages containing dead animals to be plainly marked "when shipped by interstate commerce." See *Rupert* v. *United States,* 181 F. 87, 88, 91, where an indictment under the Act charged interstate shipments. The statute preventing passage of lottery tickets in interstate commerce, 62 Stat. 762, 18 U. S. C. (Supp. III) § 1301, contains no labeling, marking, or information requirements. Neither do the stolen property statutes. 62 Stat. 805, 806, 807, 63 Stat. 96, 18 U. S. C. (Supp. III) §§ 2311–2317.

that the Government's pleadings raise, and no doubt were intended to raise, a far-reaching question as to the extent of congressional power over matters internal to the individual states.

Of course, Congress possesses not only power to regulate commerce among the several states but also an inexact power "to make all laws which shall be necessary and proper for carrying into execution" its enumerated powers. In some instances Congress has left to an administrative body, such as the Interstate Commerce Commission or the National Labor Relations Board, the power to decide on a case-to-case basis whether the particular intrastate activity affects interstate commerce so as to warrant exercise of the power to reach into intrastate affairs.[8] Decisions under this type of legislation give the Government no support, for no such determination is required by this Act, and the Government asserts no such finding by anyone is necessary. In other statutes Congress has set up economic regulations which lay hold of activities in interstate commerce but also include intrastate activities so intermingled therewith that separa-

---

[8] Interstate Commerce Act, 36 Stat. 550, as amended, 41 Stat. 484, 49 U. S. C. § 13 (4), *Houston, E. & W. T. R. Co.* v. *United States,* 234 U. S. 342, 357–359; *Florida* v. *United States,* 282 U. S. 194; *North Carolina* v. *United States,* 325 U. S. 507, 511; *King* v. *United States,* 344 U. S. 254, 267–276. National Labor Relations Act, 49 Stat. 450, 452, 453, 454, 455, 29 U. S. C. §§ 152 (6), (7), 155, 160 (a), (e), (f), as amended, 61 Stat. 138, 140, 146, 147–148, 29 U. S. C. (Supp. III) §§ 152 (6), (7), 155, 160 (a), (e), (f), *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 31, 47; *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41, 49–50; *Newport News Shipbuilding & Dry Dock Co.* v. *Schauffler,* 303 U. S. 54, 57–58; *Santa Cruz Fruit Packing Co.* v. *Labor Board,* 303 U. S. 453, 466–468; *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 223–224; *Labor Board* v. *Denver Building & Construction Trades Council,* 341 U. S. 675, 683–684.

tion is impractical or impossible.[9]  Of course, decisions upholding legislation requiring information in aid of the taxing power [10] afford no support here, because the taxing power penetrates and permeates every activity, intrastate or interstate, within the Nation.  While general statements, out of these different contexts, might bear upon the subject one way or another, it is apparent that the precise question tendered to us now is not settled by any prior decision.

The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative.  *United States* v. *Rumely,* 345 U. S. 41.  This is not because we would avoid or postpone

---

[9] Hours of Service Acts (Railroads), 34 Stat. 1415, 45 U. S. C. §§ 61–64, *Baltimore & O. R. Co.* v. *I. C. C.,* 221 U. S. 612; Interstate Commerce Act, 34 Stat. 584, 49 U. S. C. § 1 *et seq., Interstate Commerce Comm'n* v. *Goodrich Transit Co.,* 224 U. S. 194; Grain Futures Act, 42 Stat. 998, as amended, Commodity Exchange Act, 49 Stat. 1491, 7 U. S. C. § 1 *et seq., Board of Trade of Chicago* v. *Olsen,* 262 U. S. 1; Ashurst-Sumners Act (Convict-Made Goods), 49 Stat. 494, 18 U. S. C. §§ 396b, 396c, *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334; Tobacco Inspection Act, 49 Stat. 731, 7 U. S. C. §§ 511a–511q, *Currin* v. *Wallace,* 306 U. S. 1; Agricultural Adjustment Act of 1938, 52 Stat. 31, as amended, 7 U. S. C. § 1281 *et seq., Mulford* v. *Smith,* 307 U. S. 38; as amended, 55 Stat. 203, 7 U. S. C. § 1340, *Wickard* v. *Filburn,* 317 U. S. 111; Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U. S. C. § 201 *et seq., United States* v. *Darby,* 312 U. S. 100; *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186; Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U. S. C. § 608c, *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110; Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, 21 U. S. C. § 301 *et seq., United States* v. *Walsh,* 331 U. S. 432; *United States* v. *Sullivan,* 332 U. S. 689.

[10] *United States* v. *Doremus,* 249 U. S. 86; *Nigro* v. *United States,* 276 U. S. 332; *Sonzinsky* v. *United States,* 300 U. S. 506; *United States* v. *Kahriger,* 345 U. S. 22.

difficult decisions. The predominant consideration is that we should be sure Congress has intentionally put its power in issue by the legislation in question before we undertake a pronouncement which may have far-reaching consequences upon the powers of the Congress or the powers reserved to the several states. To withhold passing upon an issue of power until we are certain it is knowingly precipitated will do no great injury, for Congress, once we have recognized the question, can make its purpose explicit and thereby necessitate or avoid decision of the question. Judicial abstention is especially wholesome where we are considering a penal statute. Our policy in constitutional cases is reinforced by the long tradition and sound reasons which admonish against enlargement of criminal statutes by interpretation.

This Court does and should accord a strong presumption of constitutionality to Acts of Congress. This is not a mere polite gesture. It is a deference due to deliberate judgment by constitutional majorities of the two Houses of Congress that an Act is within their delegated power or is necessary and proper to execution of that power. The rational and practical force of the presumption is at its maximum only when it appears that the precise point in issue here has been considered by Congress and has been explicitly and deliberately resolved.[11] But the presumption can have little realism when responsible congressional committees and leaders, in managing a bill, have told Congress that the bill will not reach that which the Act is invoked in this Court to cover.

We do not question that literal language of this Act is capable of the broad, unlimited construction urged by the Government. Indeed, if it were enacted for a

---

[11] Cf. *United States* v. *Bekins,* 304 U. S. 27, with *Ashton* v. *Cameron County Water Improvement District,* 298 U. S. 513.

unitary system of government, no other construction would be appropriate. But we must assume that the implications and limitations of our federal system constitute a major premise of all congressional legislation, though not repeatedly recited therein. Against the background of our tradition and system of government, we cannot say that the lower courts, which have held as a matter of statutory construction that this Act does not reach purely intrastate matters, have not made a permissible interpretation.[12] We find in the text no unmistakable intention of Congress to raise the constitutional questions implicit in the Government's effort to apply the Act in its most extreme impact upon affairs considered normally reserved to the states.

Judges differ as to the value of legislative history in statutory construction, but the Government often relies upon it to sustain its interpretation of statutes. However, in this case its reference to legislative history is conspicuously meager and unenlightening.[13] On the other hand, for what it is worth, appellees point out much that was reported by responsible committees and said by proponents of this antigambling-device legislation to indicate that Congress did not intend to raise the issues

---

[12] *United States* v. *Denmark*, 119 F. Supp. 647; *United States* v. *Braun*, 119 F. Supp. 646; *United States* v. *Five Gambling Devices*, 119 F. Supp. 641; *United States* v. *15 Mills Blue Bell Gambling Machines*, 119 F. Supp. 74; *United States* v. *178 Gambling Devices*, 107 F. Supp. 394.

[13] The Government cites passages from the House Committee Report to the effect that slot machines and similar gambling devices are resulting in substantial revenues to Nation-wide crime syndicates. H. R. Rep. No. 2769, *supra*, at 4–6. The Government also refers to statements by a Congressman and the president of a company which manufactures gambling devices to the effect that these syndicates operate in every state in the Union and reap profits in the billions of dollars. Hearings on S. 3357, *supra*, at 10–12, 23, 28, 29, 182, 185, 191–192; 96 Cong. Rec. 13638.

here presented and was not aware it was doing so. For example, Senator Johnson, sponsor of the bill which eventually became this Act, declared that ". . . it keeps the Federal Government out of State and local police powers; no Federal official is going to become an enforcement officer in any State or locality." [14] The committee handling the bill reported: "On the other hand, the committee desires to emphasize that Federal law enforcement in the field of gambling cannot and should not be considered a substitute for State and local law enforcement in this field." [15] But here it was the Federal Bureau of Investigation which entered a country club and seized slot machines not shown ever to have had any connection with interstate commerce in any manner whatever. If this is not substituting federal for state enforcement, it is difficult to know how it could be accomplished. A more local and detailed act of enforcement is hardly conceivable. These cases, if sustained, would substantially take unto the Federal Government the entire pursuit of the gambling device.

No committee appears to have anticipated this, for the then Attorney General informed the committee, and it reported itself in agreement with the view, that "Actually enforcement against those people who gamble or use these machines wrongfully in the States is left with the States, and with the local officials, and there is absolutely no intention on the part of the Federal Government, express or otherwise, in this bill or anything that accompanies it, to get us into a prohibition era." [16] It is

---

[14] 96 Cong. Rec. 15107. For similar statements by Senator Johnson, see 96 Cong. Rec. 15103, 15105.

[15] H. R. Rep. No. 2769, *supra*, at 5.

[16] *Ibid.* See also statements by Senator Ferguson, 96 Cong. Rec. 15104; and Representatives Rogers, 96 Cong. Rec. 13643–13644, 16853; Bryson, 96 Cong. Rec. 13649; Rees, 96 Cong. Rec. 13654, and Dolliver, 96 Cong. Rec. 13638.

impossible to reconcile statements of this kind, on which the Congress may have placed reliance, with the Government's present interpretation of the Act.

As we have indicated, the present indictments and libel are so framed as to apply in extreme form the most expansive interpretation of this Act. All that we would decide at present is a question of statutory construction. We think the Act does not have the explicitness necessary to sustain the pleadings which the Government has drafted in these cases. On this ground alone, we would affirm the judgments below.

*Judgments affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring.

I concur in the judgment, but regret my inability to agree with the reasons for affirmance expressed in the opinion of MR. JUSTICE JACKSON. The language of § 3 of the Act on which the charges rest requires dealers to report "all sales and deliveries of gambling devices . . . ." No other language in the Act, and nothing in its legislative history, indicates to me that Congress was not here hitting at "all sales," including purely intrastate ones. In this situation I do not feel at liberty to read intrastate sales out of the Act, even if constitutional questions could thereby be avoided.*

Section 3 requires a gambling device dealer to register with the Attorney General "his name or trade name, the address of his principal place of business, and the ad-

---

*Holding that the Act requires reports of interstate sales would raise a serious constitutional question. The Act makes it a crime to transport gambling devices in interstate commerce. Consequently, requiring monthly reports of sales and deliveries made by an interstate dealer would require him to make monthly reports of his own crimes. The Fifth Amendment provides that no person shall be compelled "to be a witness against himself."

dresses of his places of business *in such district."* (Emphasis supplied.) Thereafter dealers must make detailed monthly reports of inventories, sales and deliveries for the "places of business" in the district. But the use of the phrase "such district" is bound to leave a dealer bewildered. Does the phrase refer to the place where a dealer is compelled to file his papers? Or does it simply force him to tell in what "district" he maintains "places"? If a dealer is able to solve this puzzle, how is he to find "such district"? The Act gives no hint as to where the "district" is or how a person can locate it. It never describes any "district." Yet failure to comply with these unascertainable requirements is punishable by fine up to $5,000, imprisonment up to two years, or both. This punishment, at least, is certain. I would apply the established rule that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Construction Co.,* 269 U. S. 385, 391.

Nor can a criminal statute too vague to be constitutionally valid be saved by additions made to it by the Attorney General. Of course, Congress could have prescribed that reports should be made at reasonably accessible places designated by the Attorney General. Cf. *United States* v. *Eaton,* 144 U. S. 677. But the Act under consideration did not do this. The Attorney General did promulgate an attempted clarifying regulation under the purported authority of R. S. § 161, 5 U. S. C. § 22. That statute provides no more than a general authorization to the heads of all departments to prescribe regulations governing their departments, officers, clerks, records, papers, etc. There is certainly not sufficient specificity in this grant concerning routine departmental business to support the Attorney General's attempt to

infuse life into an Act of Congress unenforceable for vagueness. The vital omission in this criminal statute can be supplied by the legislative branch of government, not by the Attorney General. I would affirm these judgments.

MR. JUSTICE CLARK, with whom THE CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE BURTON concur, dissenting.

I.

I agree with MR. JUSTICE BLACK on the question of statutory construction, that § 3 of the Act means just what it says: "every manufacturer of and dealer in gambling devices" is required to register with the Attorney General and file with him certain records, without reference to interstate commerce. MR. JUSTICE JACKSON's opinion states that "this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative." I agree; but I think that the statutory language involved here leaves no reasonable alternative. It would be difficult for Congress to be more explicit than to direct the statute's mandate, as it has here, to "every" manufacturer and dealer without qualification. In *United States* v. *Sullivan,* 332 U. S. 689 (1948), the Court dealt with a highly analogous situation; the opinion of the Court there was that "A restrictive interpretation should not be given a statute merely because . . . giving effect to the express language employed by Congress might require a court to face a constitutional question." 332 U. S., at 693.

If by legislative history or otherwise it could persuasively be shown that Congress intended that the word "every" be given other than its plain meaning, we should likely consider such evidence in interpreting the statute.

See *Boston Sand Co.* v. *United States,* 278 U. S. 41, 48 (1928). But I think the legislative history on this issue is almost totally unenlightening.[1] Of the meager evidence available perhaps strongest support is furnished the construction resulting from a literal reading of the section. The bill, including the part of § 3 here in issue as passed without discussion, was drafted pursuant to the resolution of a "crime conference" consisting of leading national and local officials and others interested in law enforcement, in cooperation with the Department of Justice. The conference's unanimous resolution was *"Resolved,* That this conference endorse the idea of Federal legislation to prohibit the shipment of gambling devices into or out of any State where the possession or use of such devices is illegal. Further, *requiring Federal registration of all such machines sold within States."* [2] The bill was drafted shortly thereafter by the Justice Department, with § 3 requiring registration and filing by "every" dealer and manufacturer. That part of the section was never changed and apparently was never discussed by Congress.

---

[1] The quoted and cited statements of Senator Johnson occurred in the course of debate on the bill as a whole and particularly in reference to its ban on certain interstate shipments. Apparently the only mention of the scope of § 3 was the statement from the conference report that the bill "requires manufacturers and dealers in gambling devices to register annually with the Attorney General of the United States." 96 Cong. Rec. 15106. This statement occasioned no discussion. The Attorney General's statement that no "prohibition era" was contemplated and the committee report to the same effect apparently were designed to assure some Senators that the thrust of the Act was not at the gamblers, the users of the machines, who were to be left to state law enforcement measures and officials. However this may be, I suggest that the question of who was to enforce the various provisions of the Act—state officers or federal officers—is scarcely relevant to show congressional intent as to the scope of § 3.

[2] 96 Cong. Rec. 15102. (Emphasis supplied.)

Concededly, to give the provision its literal meaning affords far more effective enforcement with respect to other sections of the Act than would be the case if any of the other suggested interpretations were applied.[3]

For these reasons I am unable to agree with the solution of these cases offered by MR. JUSTICE JACKSON.

## II.

I am also unable to agree that the statute is unconstitutionally vague.

Section 3 requires that at specified times "every manufacturer of and dealer in gambling devices shall register with the Attorney General his name or trade name, the address of his principal place of business, and the addresses of his places of business in such district," and that there be filed monthly with the Attorney General "an inventory and record of all sales and deliveries of gambling devices as of the close of the preceding calendar month for the place or places of business in the district."

I do not mean to suggest that these provisions are models of clarity; when words are left in a statute by oversight, exemplary draftsmanship hardly results. But our function is not to discipline Congress for its failure to dot the i's and cross the t's. It is rather to make certain that the conduct required has been made sufficiently clear that to impose sanctions for ignoring the statute's requirements will not violate due process of law.

---

[3] The construction urged by the appellees differs from that of MR. JUSTICE JACKSON. They state: ". . . the proper construction of this Act, we feel, is this: that all shipments of gambling devices in interstate commerce are prohibited except to those States where the same are legal. *Manufacturers or dealers shipping into those States where it is legal should be required to register* with the Attorney General and file an inventory." Brief of Appellees in Nos. 40 and 41, p. 8. (Emphasis supplied.) This construction would seem to circumvent the possible self-incrimination aspects suggested by MR. JUSTICE BLACK; it would also unduly strain statutory construction.

The appellees ask us to hold that this is a case "where patently ambiguous language is so unclear and equivocal as to render its enforcement a denial of due process"; they argue that conviction here violates the rule that "no one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes," and that all are entitled to be informed as to what the statute commands or forbids, citing *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939). In my view speculation is not here required, unless one seeks to avoid compliance with the law; I think that all who would comply with the law are sufficiently informed of what is required of them to assure that any bona fide attempt at compliance would be successful.

Appellees' complaint, according to their brief, appears to be not that the statute does not tell them what to file, but that it does not tell them where to file it. As I read the Act, several things are at once apparent: (1) the registrant must register with someone his name and the addresses of all his places of business, designating the principal one if he has more than one; (2) he must file monthly an inventory and record of all sales and deliveries of gambling devices; (3) this registration and filing must be done with the Attorney General—for the Act provides in clearest terms that he "shall register with the Attorney General his name" etc., and that he "shall file with the Attorney General an inventory" etc. I take it that, aside from 5 U. S. C. § 291 which provides that the Attorney General shall be at the seat of government, it is common knowledge that the Attorney General is located in Washington, D. C. There can be no doubt that the required information sent to him there would amount to compliance. If one desired to give meaning to "district," the Attorney General has United States Attorneys representing him throughout the country. There can be no doubt that the required information sent to the At-

torney General through a local United States Attorney would amount to compliance. At any rate the Act did not leave room for doubt that the Attorney General was to receive the specified information. Subsequent to passage of the Act the Attorney General, acting pursuant to 5 U. S. C. § 22, provided by regulation that the required information should be sent to him in Washington, with an exception made in the case of dealers and manufacturers in Illinois (apparently the center of the affected industry), who were directed to register and file with the United States District Attorney there. If there was ever bona fide doubt as to where to file the information, the Attorney General had now made his whereabouts for purposes of the Act crystal clear.

The Constitution requires that a statute must not be too vague to allow the citizen to ascertain what course of conduct he must follow to put himself safely within the bounds of the law. *Lanzetta* v. *New Jersey, supra.* No doubt the forgotten words in the Act provide room for quibbling; and the lawyer who is looking for litigation, or whose client seeks to avoid compliance with the law, can paint a picture of uncertainty and frustrated effort to fathom the unfathomable intent of Congress. But to me it is certain that, with or without the regulations, a person honestly seeking to comply with this law would inevitably have succeeded, without undue mental strain in determining the statute's import and without uncertainty as to his chances of remaining within the bounds of the law. The certainty required by the Due Process Clause is not tested from the would-be violator's standpoint; the test is rather whether adequate guidance is given to those who would be law-abiding. See *Musser* v. *Utah,* 333 U. S. 95, 97 (1948). The constitutional requirements are met when the statute prescribes a course of conduct which any person acting in good faith can recognize and act upon. The presence of the forgotten

words in this statute does not transform into a trap for the unwary the express requirements of registration and filing with the Attorney General specified information about one's person, business and places of business.

## III.

The ultimate question presented by these cases is whether Congress has exceeded its constitutional power. I think it has not.

It appears that Congress in this Act has embarked on what it deemed the most effective course of action possible to eliminate one of the major sources of income to organized crime, while at the same time yielding to the policy of Nevada and a few other states where slot machines are legal and the underworld's control and profit are correspondingly minimized. The Act prohibits shipment of gambling devices into any state except those which act to exempt themselves from the statute. Section 3, which sets up the registration and filing requirements here in issue, was designed to make effective and enforceable the interstate shipment ban. It was thought that a report on each transfer of each machine before and after interstate shipment would enable enforcement officials to ascertain who transported the machine across state lines and thereby violated the law. Unless all such local sales were reported, it was thought that it would be an easy matter to conceal the identity of the interstate transporter by resorting to straw-man transactions, coverup intrastate "sales" before and after interstate shipment, and the like. In view of the established tie-up between slot machines and "Nation-wide crime syndicates," [4] more stringent methods of enforcement were deemed necessary to accomplish the ban on interstate

[4] H. R. Rep. No. 2769, 81st Cong., 2d Sess., pp. 4–6; S. Rep. No. 307, 82d Cong., 1st Sess., p. 55, published after passage of the Act, made this relationship even more clear.

transportation of the machines than would be needed to control an activity in which dealers and manufacturers could be presumed to be law-abiding citizens who kept accurate books and accounts. The net effect of these considerations is to clearly establish that the registration and filing requirements of the Act amount to reasonably necessary, appropriate, and probably essential means for enforcing the ban on interstate transportation of gambling devices.

The question presented, then, is whether Congress is empowered by the Constitution to require information, reasonably necessary and appropriate to make effective and enforceable a concededly valid ban on interstate transportation of gambling devices, from persons not shown to be themselves engaged in interstate activity. I think that an affirmative answer is not inevitably dictated by prior decisions of the Court; but, more important, no decision precludes an affirmative answer. The question has not been previously decided because the legislative scheme utilized here apparently has not been heretofore attempted. But its novelty should not suggest its unconstitutionality.

In the body of decisional law defining the scope of Congress' powers in regard to interstate commerce, it has been clearly established that activities local in nature may be *regulated* if they can fairly be said to "affect" commerce, or where local goods are commingled with goods destined for interstate commerce, or were previously in interstate commerce.[5] For present purposes, these cases at least

[5] *E. g., United States* v. *Darby,* 312 U. S. 100 (1941); *Wickard* v. *Filburn,* 317 U. S. 111 (1942); *Currin* v. *Wallace,* 306 U. S. 1 (1939); *United States* v. *Sullivan,* 332 U. S. 689 (1948). In *United States* v. *Darby, supra,* at 121, the Court summarized the power of Congress to control local activities as follows:

"Congress, having by the present Act adopted the policy of excluding from interstate commerce all goods produced for the commerce

establish that activities or goods intrastate in nature are not immune from congressional control where they are sufficiently related to interstate activities or goods controlled by Congress.

The Court also has on several occasions stated that the commerce power "extends to those activities intrastate which so affect interstate commerce *or the exercise of the power of Congress over it* as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." [6] I think it may accurately be said that every sale of slot machines affects the exercise of the power of Congress over commerce, in view of the elusive

---

which do not conform to the specified labor standards, it may choose the means reasonably adapted to the attainment of the permitted end, even though they involve control of intrastate activities. Such legislation has often been sustained with respect to powers, other than the commerce power granted to the national government, when the means chosen, although not themselves within the granted power, were nevertheless deemed appropriate aids to the accomplishment of some purpose within an admitted power of the national government. See *Jacob Ruppert, Inc.* v. *Caffey*, 251 U. S. 264; *Everard's Breweries* v. *Day*, 265 U. S. 545, 560; *Westfall* v. *United States*, 274 U. S. 256, 259. . . . Similarly Congress may require inspection and preventive treatment of all cattle in a disease infected area in order to prevent shipment in interstate commerce of some of the cattle without the treatment. *Thornton* v. *United States*, 271 U. S. 414. . . . And we have recently held that Congress in the exercise of its power to require inspection and grading of tobacco shipped in interstate commerce may compel such inspection and grading of all tobacco sold at local auction rooms from which a substantial part but not all of the tobacco sold is shipped in interstate commerce. *Currin* v. *Wallace* [306 U. S. 1], and see to the like effect *United States* v. *Rock Royal Co-op.* [307 U. S. 533]."

[6] *United States* v. *Darby, supra,* at 118; *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110, 119 (1942); *Wickard* v. *Filburn, supra,* at 124. (Emphasis supplied.)

nature of the object whose interstate shipment is being controlled.

The Constitution empowers Congress "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . ." *McCulloch* v. *Maryland,* 4 Wheat. 316, 421 (1819), cited in the foregoing cases, interprets this as follows:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

The Court in that case added that much leeway is to be given Congress in determining what means are appropriate. 4 Wheat., at 423.

In their brief appellees attack the power of Congress under the Constitution solely on the basis that the registration and filing requirements are not reasonable means of enforcing the provision against interstate transportation of slot machines. I believe that the reasonableness and the necessity of the requirements have already been adequately demonstrated. None of the cases relied on by the appellees suggests a contrary conclusion. The Act's requirements of registration and filing as to local transactions are certainly not a mere ruse designed to invade areas of control reserved to the states, but are "naturally and reasonably adapted to the effective exercise of" the commerce power.[7]

If Congress by § 3 had sought to *regulate* local activity, its power would no doubt be less clear. But here there is no attempt to regulate; all that is required is information in aid of enforcement of the conceded power to ban interstate transportation. The distinction is sub-

---

[7] Compare *Linder* v. *United States,* 268 U. S. 5, 17 (1925).

stantial. See *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194, 211 (1912).[8]

In my view Congress has power to require the information described in § 3 of the Act since the requirement is a means reasonably necessary to effectuate the prohibition of transporting gambling devices interstate. If it be suggested that such a holding would open possibilities for widespread congressional encroachment upon local activities whose regulation has been reserved to the states, I would point out, first, that power of *regulation* heretofore exclusively vested in the states remains there; and second, that the situation here is unique: the commodity involved is peculiarly tied to organized interstate crime and is itself illegal in the great majority of the states, and the federal law in issue was actively sought by local and state law enforcement officials as a means to assist them, not supplant them, in local law enforcement. I would *reverse* the judgments.[9]

---

[8] Compare *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186 (1946), holding that Congress can empower the Administrator of the Fair Labor Standards Act to issue subpoenas *duces tecum* to obtain information from a corporation to determine whether it is covered by the Act or has violated it.

[9] Once it is established that Congress can require registration and filing, I view the forfeiture sanction imposed in No. 14 as an alternative method of enforcement, which presents no substantial additional issue. Compare *United States* v. *Stowell*, 133 U. S. 1 (1890).