Ronald V. DELLUMS, Eleanor Ginsberg, Myrna Cunningham, Plaintiffs,

v.

William French SMITH, individually and in his official capacity as Attorney General of the United States, D. Lowell Jensen, individually and in his official capacity as Assistant Attorney General, Criminal Division of The United States Department of Justice, Defendants.

No. C–83–3228 SAW.

United States District Court, N.D. California.

Jan. 10, 1984.

Jules Lobel, University of Pittsburgh Law School, Pittsburgh, Pa., Ellen Yaroshefsky, Michael D. Ratner, Margaret L. Ratner, Sarah Wunsch, Peter Weiss, Center for Constitutional Rights, New York City, Marc Van Der Hout, Nat. Lawyers Guild, San Francisco, Cal., for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Richard K. Willard, David J. Anderson, Vincent M. Garvey, David H. White, Attys., Dept. of Justice, Washington, D.C., Joseph P. Russoniello, U.S. Atty., John F. Barg, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER DENYING MOTION TO ALTER JUDGMENT

WEIGEL, Senior District Judge.

This matter is before the Court on defendants' motion to alter the Court's judgment of November 3, 1983.

### Background

Plaintiffs filed suit to require the Attorney General to conduct a preliminary investigation as to whether the President, the Secretary of State, the Secretary of Defense and other federal executive officers have violated the Neutrality Act, a federal criminal law, by supporting paramilitary operations against Nicaragua. The Neutrality Act, 18 U.S.C. § 960, declares that:

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or any colony, district, or people with whom the United States is at peace, shall be fined not more than $3,000 or imprisoned not more than three years, or both.

Plaintiffs' complaint was founded upon the Ethics in Government Act, 28 U.S.C. §§ 591–598, which directs the Attorney General to conduct a preliminary investigation upon receiving specific information from a credible source that federal criminal law has been violated by any federal official designated in the statute.

The Court found, and the Attorney General has since admitted, that the information presented by plaintiffs was sufficiently specific and that it came from a sufficiently credible source. *Dellums v. Smith*, 573 F.Supp. 1489 at 1504–1505 (N.D.Cal.1983).[1] The Court also determined that officials covered by the Ethics in Government Act *may* have violated the Neutrality Act. *See id.* at 1502 n. 11. For these reasons, the Court ordered the Attorney General to conduct a preliminary investigation as required by the Ethics in Government Act. *Id.* at 1504–1505. Pursuant to the same statute, the Court also ordered that unless the Attorney General makes a determination within ninety days that there are no reasonable grounds to believe that further investigation is warranted, he must apply

---

1. The Attorney General now agrees that the information presented was sufficiently specific and came from a sufficiently credible source. Transcript of Oral Argument, December 15, 1983 (hereafter simply referred to as "Tr.") p. 4, lines 4–5. Indeed, evaluation of that information reveals a formidable array of specific allegations. *See id.* at pages 3 and 4 and Complaint, Exhibits A and B.

for the appointment of independent counsel. *Id.* at 1505.

Defendants, in opposing plaintiffs' motion for summary judgment and moving for dismissal of the action, argued that plaintiffs lack standing to sue, that the Ethics in Government Act does not grant a private right of action to plaintiffs, that the ruling sought requires an impermissible advisory opinion, and that the action presents a nonjusticiable political question. The Court rejected each of these contentions and granted plaintiffs' motion for summary judgment.

For more complete details of the facts and law underlying the Court's decision of November 3, 1983, see Memorandum for Judgment filed on that date.

### The Motion To Alter Judgment

Relying upon Federal Rule of Civil Procedure 59(e), defendants now move to alter judgment. They argue for the first time that the Neutrality Act does not apply to any action authorized by the President. They now argue further that, in any event, a preliminary investigation is not required because the Attorney General has established a policy that federal executive officials will not be prosecuted under the Act.

Plaintiffs urge that these claims come too late. They point out that their first brief in support of their motion for summary judgment argued extensively that the Neutrality Act applies to government officials, including the President, and that the allegations presented by plaintiffs showed a violation of the Act. Despite full opportunity to do so, defendants did not contest the plaintiffs' position on these issues until after the Court handed down its decision on November 3, 1983.

Therefore, it would be proper for the Court to deny defendants relief under Rule 59. *See Briggs & Stratton Corp. v. Baldrige,* 544 F.Supp. 667, 668 (E.D.Wis.1982); *see Grumman Aircraft Engineering Corp. v. Renegotiation Board,* 482 F.2d 710, 721 (D.C.Cir.1973), *rev'd on other grounds,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). However, because of the importance of the issues presented by this case, the Court exercises its discretion to address the merits of defendants' motion. *See Briggs & Stratton,* 544 F.Supp. at 668.

The primary argument now advanced by defendants is that the refusal to conduct a preliminary investigation should be upheld because the facts presented by plaintiffs are "legally insufficient" to establish a violation of the Neutrality Act. The facts presented by the plaintiffs consist of specific and credible information to the effect that the President and other officials in the executive branch have sponsored paramilitary activities directed against the Government of Nicaragua. The defendants say that because the activities alleged by plaintiffs were authorized by the President, there can be no violation of the Neutrality Act.

Defendants also urge that even if the Attorney General may be wrong about this, so long as his interpretation is "reasonable", it should be given deference, and no preliminary investigation should be required. The difficulty with this claim is that it is supported neither by the provisions of the Ethics in Government Act nor by the policy underlying the statute.

■ As delineated in the Court's prior opinion, a fundamental purpose of the Ethics in Government Act is to ensure that serious allegations of unlawful action by federal executive officials are subject to review by counsel independent of any incumbent administration. The Ethics in Government Act does not require a showing that "all legal elements of a crime exist" as a prerequisite for preliminary investigation. S.Rep. No. 496, 97th Cong., 2d Sess. 13, *reprinted in* 1982 U.S.Code Cong. & Ad.News 3537, 3549. The Act's mandate in favor of investigation even in cases where a law violation is doubtful is illustrated by the declaration in the Senate Report that "as soon as there is any indication whatsoever that the allegations involving a high level official may be serious or *have any potential chance of substantiation,* a special prosecutor should be appointed to take over the investigation." S.Rep. No. 170, 95th Cong., 1st Sess. 54 (1977), U.S.

Code Cong. & Admin.News 1978, pp. 4216, 4270.

■ There may be instances in which the Attorney General can properly decline to conduct a preliminary investigation, even though he has received specific information from a credible source. If such information, however specific and credible, could not reasonably be construed as involving a federal crime, the Attorney General would not be obliged to conduct a preliminary investigation. But if the information may reasonably be construed as involving a federal crime, the Attorney General may not refuse to investigate merely because his opinion is to the contrary. To make the Attorney General's opinion on a disputed question of law the ultimate measure of enforcement of the Act would subvert its very purpose. The present question is thus limited to whether the view is reasonable that the Neutrality Act proscribes the activities alleged by plaintiffs. For reasons set forth below, the question must be answered in the affirmative.

■ The contention that the Neutrality Act reaches executive officials is at least as persuasive as defendants' claim that it does not. The statute itself contains no exception for any person or official. Thus, the doctrine espoused by defendants finds no support on the face of the statute. Consideration of the English statutes upon which the Neutrality Act was modeled supports the conclusion that the American statute's broad language was chosen purposefully. The English statutes provide express exceptions for acts done with leave or license of the crown, i.e., the executive. *See* Lobel, *The Rise and Decline of the Neutrality Act: Sovereignty and Congressional War Powers in United States Foreign Policy*, 24 Harv. Int'l L.J. 1, 31–33 (1983) (hereinafter cited as "Lobel"). The ab-

sence of such provisions from the American Act reflects a decision to retain and protect the Constitution's delegation of war power to the legislative branch. *See* U.S. Const. art. I, § 8. In addition, uncontradicted authority holds that the President cannot aid or authorize private expeditions against foreign nations without the approval of Congress.

In 1806, two civilians were indicted and tried for aiding an attempt to launch an expedition against Spanish America in violation of the Neutrality Act. *United States v. Smith*, 27 F.Cas. 1192 (C.C.N.Y. 1807) (No. 16,342). As part of their defense, they sought to subpoena Secretary of State James Madison and other federal executive officials to prove their claim that their acts had been authorized by President Jefferson. *Id.* at 1228.

The Court declined to issue the requested subpoenas on the ground that such testimony of the cabinet members was immaterial. William Paterson, a Supreme Court Justice and participant in the Constitutional Convention, presided over the trial and handed down the court's opinion. He first examined the Neutrality Act and found that it "is expressed in general, unqualified terms; it contains no condition, no exception; it invests no dispensing power in any officer or person whatsoever." Justice Paterson then determined that the Constitution itself does not create such an exception for the President. "This instrument [the Constitution], which measures out the powers and defines the duties of the President, does not vest in him any authority to set on foot a military expedition against a nation with which the United States is at peace." *Id.* at 1229–30. In conclusion, Justice Paterson stated that "the law under consideration is absolute" and "requires universal obedience." [2] *Id.* at 1231.

2. A memorandum authored by the Department of Justice Office of Legal Counsel has been submitted by defendants as an exhibit to their reply memorandum. Off. Legal Counsel, Memorandum for Phillip B. Heymann re Applicability of the Neutrality Act to Activities of the Central Intelligence Agency (Oct. 10, 1979). This memorandum deals primarily with another statute that was part of the Neutrality Act, 18 U.S.C. § 959(a), and concludes that that provision is

not violated when CIA agents serve as troops in the employ of a foreign military service. 18 U.S.C. § 960 and *Smith* are distinguished as follows:

We understand this case to stand for the proposition that where an activity is not otherwise within the authority of the Executive Branch, it could not authorize a private individual to engage in it. Since the Executive cannot constitutionally wage war on a nation against

This conclusion is well-supported by the history of the Neutrality Act. One of its major purposes was to protect the constitutional power of Congress to declare war or authorize private reprisal against foreign states. *See* Lobel, *supra*, at 27–37. This purpose was recognized by early presidents. "[W]hether the interest or honor of the United States requires that they should be made a party to any such struggle, and by inevitable consequence to the war which is waged in its support, is a question which by our Constitution is wisely left to Congress alone to decide. It is by the laws already made criminal in our citizens to embarrass or anticipate that decision by unauthorized military operations on their part." President Martin Van Buren, Second Annual Message to Congress (Dec. 3, 1838), *reprinted in* 3 *Messages & Papers of the Presidents*, 483, 487 (J. Richardson ed. 1896); *see also* Inaugural Address of President John Adams (March 4, 1797), *reprinted in* 1 *Messages & Papers of the Presidents, supra*, at 231.

Believing that the Neutrality Act bound the President, congressional opponents of the law attempted unsuccessfully to amend it during the 1800's. For example, in 1854, Senator Slidell introduced a resolution seeking to amend the Neutrality Act by allowing the President to suspend its operation during any recess of Congress for up to 12 months when, "in his opinion, the public interests require" such a suspension. Cong.Globe, 33d Cong., 1st Sess. 1021, 1023–24 (1854). Slidell's proposed amendment failed. Similarly, in 1858, Senator Slidell introduced a resolution to amend the Neutrality Act to permit presidential suspension during recesses. Cong. Globe, 35th Cong., 1st Sess. 462 (1858). This proposal also failed. The Neutrality Act remains today substantially the same as it appeared in the original enactment of 1794. The failure of Senator Slidell's proposed amendments fortifies the view that the Neutrality Act grants no executive discretion to authorize paramilitary expeditions against foreign governments with which this nation is not at war.

To support their claim that the executive officials are immune from the coverage of the Act, defendants refer to provisions of the 1794 Act empowering the President to take certain actions to enforce the statute's prohibitions. *See* Act of June 5, 1794, § 8, 1 Stat. 381, 384 (1794). The existence of such enforcement powers does not preclude application of the Act to the Executive. For example, Attorney General Robert Jackson rendered the opinion that section 3 of the 1917 reenactment of the Act applied to the President and prevented the President from releasing to the British Government boats then under construction for the United States Navy. 29 Op.Atty.Gen. 484, 494–96 (1940). Attorney General Jackson reached this conclusion even though he acknowledged the provision authorizing presidential enforcement of the prohibition. *See id.* at 494.

■ Similarly misguided is defendants' reference to the President's powers and duties as "Commander in Chief of the Army and Navy of the United States," and to various military operations conducted by these forces. The paramilitary operations challenged by plaintiffs were not alleged to have been conducted by the armed forces of the United States. The legislative history of the statute indicates that it was not intended to cover the use of regular United States armed forces. *See* Lobel, *supra*, at 31 n. 159. Plaintiffs alleged that the named officials may have violated the Neutrality Act by supporting *private* expeditions. Justice Paterson ruled in *Smith* that such expeditions do not lose the taint of illegality merely because authorized by the Executive. No substantial legal au-

---

which there has been no congressional declaration of war, the President's "authorization" to a private citizen is simply immaterial. By contrast, where an activity is otherwise within the province of the Executive as is the case with intelligence gathering, we think that sovereign authorization would be found a good defense.

*Id.* at 7 n. 3.

The Department of Justice memorandum thus actually supports the contentions of plaintiffs, not those of defendants, as to the applicability of the Neutrality Act.

thority contradicts this construction of the Neutrality Act.[3]

The same distinction vitiates defendants' citation to the War Powers Resolution as an illustration of the President's plenary authority to intervene militarily in foreign countries. That resolution is directed to the President's power to introduce the "United States Armed Forces," not paramilitary or other private forces. 50 U.S.C. §§ 1541(a); 1541(c); 1547(c).

There is merit to the argument that if Congress and the President have acted jointly to prosecute and support military operations against a foreign government, the United States cannot fairly be said to be "at peace" with that nation within the meaning of the Neutrality Act, even though no formal declaration of war has issued. However, that argument is not supported by defendants' reliance on the Hughes-Ryan Amendment, 22 U.S.C. § 2422, and the Intelligence Authorization Act of Fiscal Year 1981, 50 U.S.C. § 413. These statutes do require reports to Congress on certain intelligence activities. However, congressional receipt of such reports does not constitute congressional approval of the activities reported. *See, e.g.,* S.Rep. No. 730, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad. News 4182, 4192, 4194–95. Until a preliminary investigation is conducted, it remains to be determined whether the questioned conduct has actually been reported to Congress under any of these Acts or whether the conduct was authorized by joint action of Congress and the President. Moreover, even if the activities alleged by plaintiffs constitute joint action of Congress and the President, this determination of fact must be made after, not before, a preliminary investigation. For all of these reasons, the Hughes-Ryan Amendment and the Intelligence Authorization Act do not justify the Attorney General's refusal to conduct a preliminary investigation.[4]

■ The history of the Neutrality Act and judicial precedent demonstrate the reasonableness of the view that the Act applies to all persons, including the President. The Court reaffirms its original determination that the "Executive actions alleged by plaintiffs, if true, *may* violate federal law." Consequently, in this case, a preliminary investigation may not be refused.

■ Defendants further argue that even if the Neutrality Act applies to the activities alleged by plaintiffs, a preliminary investigation is not required. In support of this argument, defendants contend that the Department of Justice determination that the Neutrality Act "is not applicable to official conduct of the Executive Branch of the Government" effectuates a general departmental policy against prosecuting federal executives who violate the Act. Defendants say the existence of that policy justifies the Attorney General's refusal to conduct any investigation under the Ethics in Government Act.[5] For reasons set forth

**3.** Defendants now suggest that *Smith* may no longer be good law. The Court notes that the Department of Justice, in a memorandum written October 10, 1979 and cited by defendants in connection with this motion, treated *Smith* as a case with continued vitality. *See supra* note 2.

**4.** Defendants' reply memorandum raises an additional contention that the Intelligence Authorization Act of 1984, passed on November 18, 1983, which appropriates $24 million for covert actions in Nicaragua, is "mutual and joint action of the Executive and Congress which confirms that the President's actions regarding Nicaragua are not unlawful." While that Act on its face is prospective in application, it might, after the facts are better developed, provide an appropriate basis for a decision not to proceed with further investigation or prosecution. However, this is not a relevant consideration in determin-

ing whether a preliminary investigation is required. *See* 28 U.S.C. § 592(a)(1).

**5.** Some portions of defendants' argument, particularly the repeated insistence that the Justice Department's determination is not judicially reviewable, can also be seen as an assertion that the decision whether to conduct a preliminary investigation is insulated from review by the doctrine of prosecutorial discretion. That claim has already been considered and rejected by this Court. *Dellums v. Smith,* 573 F.Supp. at 1500– 1501. The Ethics in Government Act clearly distinguishes the limited preliminary investigation from that which is ordinarily undertaken in connection with a prosecution. The decision whether to conduct a preliminary investigation is withdrawn from prosecutorial discretion when the Attorney General is presented with the requisite statutory information. *Id.* at 1499– 5000.

below, the Court finds that such a policy, even if shown to exist, could not constitute a valid basis for refusing to conduct a preliminary investigation. The Court therefore need not consider whether the Department has in fact established such a policy.

■ The role of Department of Justice policies against prosecution is addressed in two portions of the Ethics in Government Act. One is section 592(c)(1), which states that "[i]n determining whether reasonable grounds exist to warrant *further* investigation or prosecution, the Attorney General shall comply with the written or other established policies of the Department of Justice with respect to the enforcement of criminal laws" (emphasis added). The other is section 594(f), which provides that an "independent counsel shall, except where not possible, comply with the policies or other established policies of the Department of Justice respecting enforcement of the criminal laws." For present purposes, the only relevant question is whether the first of these provisions makes non-prosecution policies a factor to be considered in deciding whether to conduct a preliminary investigation.

Section 592(c)(1) states that the determination whether "reasonable grounds" exist to warrant further investigation and the appointment of a special prosecutor must be made "upon the completion of the preliminary investigation." The statute thus provides for consideration of non-prosecution policies only after completion of preliminary investigation, not before. The only valid grounds for declining to conduct the preliminary investigation designated in the statute are (a) the degree of specificity of the information received, and (b) the credibility of the source of the information. 28 U.S.C. § 592(a)(1). Department of Justice policies of non-prosecution are not so designated. Consequently, non-prosecution policies may be considered only after the preliminary investigation has been concluded.

This interpretation is buttressed by the legislative history of the amendment which added the language pertaining to policies of non-prosecution. The Senate Report unequivocally refers to such policies as a factor to be considered in determining whether to request a special prosecutor, rather than in determining whether to conduct a preliminary investigation. S.Rep. No. 496, 97th Cong., 2d Sess. 14–15, *reprinted in* 1982 U.S.Code Cong. & Ad.News 3537, 3550–51.

The Senate Report demonstrates that the amendment permitting consideration of established policies of non-prosecution was intended to ensure that Government officials would not be targeted in an investigation under circumstances where private citizens would escape prosecution due to such a policy. *See id.* at 15, U.S.Code Cong. & Ad.News at 3551 (amendment would eliminate unfairness resulting from "a stricter application of criminal law on federal officials"). Nothing in the Senate Report, by way of example or otherwise, justifies a refusal to investigate due to a policy of non-prosecution which results in preferred treatment for executive officials. Indeed, a policy of preferred treatment may present the kind of "special circumstances" in which Congress intended that the case "should be sent to a special prosecutor." *See id.* Certainly, the Attorney General may not refuse to conduct a preliminary investigation on the basis of any such policy.

*Conclusion*

The provisions of the Ethics in Government Act and the history of its enactment bespeak this unmistakable intention of Congress: When the Attorney General is presented with specific information from any credible source alleging that federal executives may have violated the law, the Attorney General must either conduct a preliminary investigation or apply to the court designated in the statute for appointment of independent counsel. In the case at bar, the Attorney General has admitted that the information is specific and that plaintiffs are credible sources.

■ Just as it is not for the courts to declare a federal statute unconstitutional

unless it is manifestly so, so it is not for the courts to interpret a federal statute contrary to its provisions and inconsistently with the intent of Congress.[6] This is particularly the duty of the courts in regard to the Ethics in Government Act which (1) is aimed at avoiding the conflict of interest involved in calling upon the Attorney General to prosecute one or more members of the administration of which he is a part and (2) is the only statute which gives private parties a right to challenge conduct of federal officials which may be unlawful.[7]

The case at bar presents facts uniquely appropriate to enforcement of that right of private parties. If the extensive information plaintiffs have laid before the Attorney General should turn out, upon proper investigation, to show violations of the Neutrality Act, there is danger that, unless the violations be terminated, the nation may be involved in a war not declared by Congress. War, it cannot be gainsaid, has serious consequences for all—officials and private parties alike.

For the reasons delineated in the foregoing Memorandum,

IT IS HEREBY ORDERED that defendants' motion to alter the Court's Judgment of November 3, 1983 is denied.

---

**6.** *See United States v. Watson,* 423 U.S. 411, 416, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976); *Shapiro v. Thompson,* 394 U.S. 618, 675, 89 S.Ct. 1322, 1353, 22 L.Ed.2d 600 (1969) (Harlan, J. dissenting); *United States v. Butler,* 297 U.S. 1, 67, 56 S.Ct. 312, 319, 80 L.Ed. 477 (1936). *See also United States v. Five Gambling Devices,* 346 U.S. 441, 449, 74 S.Ct. 190, 194, 98 L.Ed. 179 (1953) ("This is not a mere polite gesture. It is a deference due to a deliberate judgment by constitutional majorities of the two Houses of Congress than an Act is within their delegated power or is necessary and proper to execution of that power.").

**7.** At argument, defendants acknowledged that the purpose of the Ethics in Government Act is to deal with this conflict of interest confronted by the Attorney General when members of the executive branch are accused of wrongdoing. Tr. p. 20, line 16—p. 21, line 8. Defendants further acknowledged that no statute other than the Ethics in Government Act gives private parties any right to challenge conduct of federal officials believed to be violating criminal laws. *Id.* at p. 19, line 19—p. 20, line 4.