Jacques DE GORTER, and Suze C. De Gorter, as individuals and as co-partners, trading as Pelta Furs, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 15184.

United States Court of Appeals Ninth Circuit.

April 17, 1957.

Rehearing Denied May 21, 1957.

Walley & Davis, J. J. Walley, Los Angeles, Cal., for petitioners.

Robert B. Dawkins, Asst. Gen. Counsel, John W. Carter, Jr., Earl W. Kinter, Washington, D. C., for respondents.

Before LEMMON and CHAMBERS, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

Before us is a petition to review Order of the Federal Trade Commission to cease and desist entered on May 11, 1956, in a proceeding instituted by a complaint filed on February 25, 1955, which charged Jacques De Gorter and Suze C. De Gorter, as individuals and as partners, trading as "Pelta Furs", with the violation of the Fur Products Labeling Act[1] and Rule 44 of the rules promulgated by the Commission under the Act.[2]

More particularly, in addition to the violation of the regulation cited, they charged violation of § 5(a)(1) and (6) of the special Act[3] and what are now §§ 2(a)(1) and 2(a)(6) of the Federal Trade Commission Act, as amended in 1952.[4]

The De Gorters will be referred to as "the petitioners". However, as Jacues De Gorter was a witness in the case, we shall, in speaking of his testimony and admissions, for brevity, refer to him as "De Gorter".

After hearings were had before a Hearing Examiner, he rendered an Initial Decision on November 18, 1955. We need not concern ourselves with its details, for on appeal, the Commission, with two members dissenting, set it aside and filed its own Findings and Order on May 11, 1956, directing the petitioners to cease and desist from (a) misbranding fur products, (b) falsely and deceptively invoicing fur products and (c) falsely and deceptively advertising fur products, all in particulars to be referred to in detail hereafter.

The Order was based on the findings of the Commission that the petitioners had violated the sections referred to of the Fur Products Labeling Act and Regulation 44 enacted under it, and that their activities also constituted unfair and deceptive practices and unfair methods of competition in commerce within the intent and meaning of the Federal Trade Commission Act.

## I.

### The Scope of Review

■ On this type of review, this Court will not entertain questions not raised before the Administrative body.[5] And the basic statute declares specifically that, on review, the Commission's Findings as to facts, if supported by evidence, shall be conclusive.[6]

The courts, including this Court, have applied this mandate consistently.[7] In assaying the facts found by the Commission, the Courts are aware that, in dealing with unfair competition, Congress advisedly left the concept flexible to be defined with particularity by the myriad of cases from the field of business.[8]

■■ The enactment of the Administrative Procedure Act[9] has placed

1. 15 U.S.C.A. § 69 et seq.

2. 16 C.F.R., 1949 ed., Supp., § 301.44.

3. 15 U.S.C.A. § 69c(a) (1) and (6).

4. 15 U.S.C.A. § 45(a) (1) and (6).

5. United States v. L. A. Tucker Truck Lines, Inc., 1952, 344 U.S. 33, 35–37, 73 S.Ct. 67, 97 L.Ed. 54; Federal Power Commission v. Colorado Interstate Gas Co., 1955, 348 U.S. 492, 500–501, 75 S.Ct. 467, 99 L.Ed. 583.

6. 15 U.S.C.A. § 45(c).

7. "The weight to be given to the facts and circumstances admitted, as well as the inferences reasonably to be drawn from them, is for the commission." Federal Trade Commission v. Pacific States Paper Trade Association, 1927, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534. And see, Electro Thermal Co. v. Federal Trade Commissioner, 9 Cir., 1937, 91 F.2d 477, 479; Lane v. Federal Trade Commission, 9 Cir., 1942, 130 F.2d 48, 50; Philip R. Park, Inc., v. Federal Trade Commission, 9 Cir., 1943, 136 F.2d 428, 429; American Medicinal Products, Inc., v. Federal Trade Commission, 9 Cir., 1943, 136 F.2d 426, 427; E. F. Drew & Co., Inc., v. Federal Trade Commission, 2 Cir., 1956, 235 F.2d 735, 740–741.

8. Federal Trade Commission v. Motion Picture Advertising Service Co., 1953, 344 U.S. 392, 394, 73 S.Ct. 361, 97 L.Ed. 426.

9. 5 U.S.C.A. § 1009(e).

upon the courts the responsibility of reviewing the entire record with the object of determining whether, on the whole, substantial evidence sustained the action of the administrative body.[10] This means that

"* * * the findings are to be accepted unless they are unsupported by substantial evidence on the record considered as a whole."[11]

So doing, Courts will not substitute their judgment for that of the Commission. As stated by the Court of Appeals for the Second Circuit recently,

"It was for it, not for us, to pass upon the credibility of the witnesses and the weight to be given their testimony in the light of it all, conflicting or otherwise. * * * Having done so, the findings of the Commission, when, as here, the record as a whole gives them substantial support, are final *even though the evidence is so conflicting that it might have supported the contrary* had such findings been made."[12] (Emphasis added.)

In view of the aim of the Congress to vest in the Commission the power to determine what unfair practices are detrimental to interstate commerce, in reviewing an order to cease and desist we should not segmentize the facts but rather take a comprehensive view of the whole record in order to determine whether the Commission has exercised, in a legal manner, the functions committed to it by the Congress.[13]

## II.

### The Commerce Clause

Applying the rule which limits review to the questions presented to the Commission,[14] three questions are involved: (1) whether the petitioners are engaged in interstate commerce, (2) whether the practices are unfair under the terms of the particular Act, Rule 44 of the Commission, and the Federal Trade Commission Act, and (3) if they are, whether the Rule is within the rule-making authority conferred on the Commission by the Fur Products Labeling Act.[15]

■■ The three problems thus postulated are so interrelated that, while we shall, in what follows, attempt to give a definite answer to each, in the interest of brevity and to avoid repetition, no clearly defined line will be drawn in discussing the legal principles or facts as they relate to one or the other of the problems. We begin by stating that the constitutional grant of power to regulate commerce between the states[16] gives the Congress a power which is both plenary and absolute. As stated by the Supreme Court in a noted case,

"This power over commerce when it exists is complete and perfect."[17]

As stated succinctly in the same case, in exercising it the Congress may prohibit purely local activities:

"Activities conducted within state lines do not by this fact alone escape the sweep of the Commerce

10. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456; see, National Labor Relations Board v. Babcock & Wilcox Co., 1956, 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975.

11. O'Leary v. Brown-Pacific-Maxon, Inc., 1951, 340 U.S. 504, 508–509, 71 S.Ct. 470, 472, 95 L.Ed. 483. And see, United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 203, 76 S.Ct. 763, 100 L. Ed. 1081.

12. Standard Distributors v. Federal Trade Commission, 2 Cir., 1954, 211 F.2d 7, 12.

And see, Tractor Training Service v. Federal Trade Commission, 9 Cir., 1955, 227 F.2d 420, 424–425.

13. Federal Trade Commission v. Standard Education Society, 1937, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141.

14. See cases cited in Note 5.

15. 15 U.S.C.A. § 69f(b).

16. United States Constitution, Art. I, § 8, Cl. 3.

17. United States v. Rock Royal Co-operative, Inc., 1939, 307 U.S. 533, 569, 59 S. Ct. 993, 1011, 83 L.Ed. 1446.

Clause. Interstate commerce may be dependent upon them." [18]

And so we find, to refer only to some recent cases, that labor relations at local level, because they affect commerce, have been made the subject of federal regulation.[19] And standards established under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., for fixing minimum wages and maximum hours have been applied to local manufacturers whose products were destined for interstate commerce.[20] The same statute has been applied to employees engaged in the maintenance and operation of a building when it appeared that the tenants of the building were engaged in the production of goods for interstate commerce.[21] An inspection statute of tobacco produced intrastate and destined

to consumers within the state as well as without has been sustained.[22] So have marketing agreements relating to agricultural products.[23] These cases promulgate no novel doctrines. They merely reassert a fundamental principal obscured at times [24] that the criterion for exercise of the Congressional power to regulate interstate commerce *is the effect* of an act upon it and *not its source*.[25]

In passing upon regulatory measures enacted under the commerce clause the courts have not drawn any rigid distinction between articles which are in the flow of commerce and those which have come to rest. Illustrative is a case involving a section of the Federal Food, Drug and Cosmetic Act of 1938, 21 U.S.C.A. § 301 et seq.[26] The section prohibits:

18. United States v. Rock Royal Co-operative, Inc., supra Note 17, 307 U.S. at page 569, 59 S.Ct. at page 1011.

19. National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 31–32, 57 S.Ct. 615, 81 L.Ed. 893.

20. United States v. Darby, 1941, 312 U.S. 100, 113–114, 657, 61 S.Ct. 451, 85 L. Ed. 609.

21. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

22. Currin v. Wallace, 1939, 306 U.S. 1, 9–11, 59 S.Ct. 379, 83 L.Ed. 441.

23. Mulford v. Smith, 1939, 307 U.S. 38, 47–48, 59 S.Ct. 648, 83 L.Ed. 1092.

24. See Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570; Federal Trade Commission v. Bunte Bros., 1941, 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881.

25. Southern Railway Co. v. United States, 1911, 222 U.S. 20, 27, 32 S.Ct. 2, 56 L. Ed. 72; Second Employers' Liability Cases, (Mondou v. New York, N. H. & H. R. Co.), 1912, 223 U.S. 1, 51, 32 S.Ct. 169, 56 L.Ed. 327. And see, Stafford v. Wallace, 1922, 258 U.S. 495, 516, 42 S. Ct. 397, 66 L.Ed. 735; Binderup v. Pathé Exchange, Inc., 1923, 263 U.S. 291, 310, 311, 44 S.Ct. 96, 68 L.Ed. 308; United States v. Food & Grocery Bureau of Southern California, D.C.Cal.1942, 43 F. Supp. 974; United States v. Standard Oil Co. of Calif., D.C.Cal.1948, 78 F. Supp. 850, affirmed sub nom. Standard

Oil Co. of Calif. v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. Other statutes of like character and the cases sustaining them, dating back to the Hours-of-Service Act applicable to Railroads, which became a law on March 4, 1907, 34 Stat. 1415, c. 2939, 45 U.S.C.A. § 61 et seq., are listed by Mr. Justice Jackson in a *footnote (9)* to his opinion in United States v. Five Gambling Devices, 1953, 346 U.S. 441, 448, 74 S.Ct. 190, 98 L.Ed. 179.

26. United States v. Sullivan, 1948, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297. A ruling made under another section of the same Act, § 301(h), upheld the application of the prohibition against a false guaranty to one engaged wholly or partly in interstate commerce irrespective of whether the guaranty *leads* in any particular instance to an illegal shipment in interstate commerce: United States v. Walsh, 1947, 331 U.S. 432, 67 S.Ct. 1283, 91 L.Ed. 1585. Very significant is this language of the Court:

"The commerce clause of the Constitution is not to be interpreted so as to deny to Congress the power to make effective its regulation of interstate commerce. Where that effectiveness depends upon a regulation or prohibition attaching regardless of whether the particular transaction in issue is interstate or intrastate in character, a transaction that concerns a business generally engaged in interstate commerce, Congress may act. Such is this case." 331 U.S. at pages 437–438, 67 S.Ct. at page 1286.

"doing of any * * * act with respect to, a * * * drug * * * if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." [27]

The court held that a retail druggist who had purchased sulfathiazole tablets from a wholesaler and who, *six months after,* removed them from a container *labelled according to the Act* and sold them in a container *not so labelled* was guilty of violation of the section. The court could find no constitutional infirmity in such application as the lower court had in relying on cases, some of which are relied on here.[28]

■ In regulating intrastate transactions it is not necessary that the regulation be confined to persons who are also engaged in interstate commerce.[29]

27. 21 U.S.C.A. § 331(k).

28. See cases cited in Note 24.

29. United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 118–122, 62 S.Ct. 523, 86 L.Ed. 726.

30. Rule 44, 16 C.F.R., 1949 ed., Supp., § 301.44, which reads:
"*Misrepresentation of prices.*
"(a) No person shall, with respect to a fur or fur product, advertise such fur or fur product at alleged wholesale prices or at alleged manufacturers cost or less, unless such representations are true in fact; nor shall any person advertise a fur or fur product at prices purported to be reduced from what are in fact fictitious prices, nor at a purported reduction in prices when such purported reduction is in fact fictitious.
"(b) No person shall, with respect to a fur or fur product, advertise such fur or fur product with comparative prices and percentage savings claims except on the basis of current market values or unless the time of such compared price is given.
"(c) No person shall, with respect to a fur or fur product, advertise such fur or fur product as being 'made to sell for', being 'worth', or 'valued at' a certain price, or by similar statements, unless

## III.

### The Purpose of the Fur Products Labeling Act

As the Congress had the power to prohibit advertising in commerce of goods either originating in interstate commerce or which might be introduced into commerce, the question is (1) did it do so when it enacted the Fur Products Labeling Act and (2) was advertising relating to price and value within the interdictions of the Act?

The Federal Trade Commission answered in the affirmative by promulgating Rule 44 specifically prohibiting certain types of misrepresentations as to prices. The full text of the Rule is reproduced in the margin.[30]

In addition to questioning the finding of the Commission that they were engaged in interstate commerce, the petitioners' chief attack against the findings of the Commission relates to Paragraph C(2) of the Order pertaining to pricing. It is reproduced in the margin.[31]

such claim or representation is true in fact.
"(d) No person shall, with respect to a fur or fur product, advertise such fur or fur product as being of a certain value or quality unless such claims or representations are true in fact.
"(e) Persons making pricing claims or representations of the types described in paragraphs (a), (b), (c) and (d) of this section shall maintain full and adequate records disclosing the facts upon which such claims or representations are based.
"(f) No person shall, with respect to a fur or fur product, advertise such fur or fur product by the use of an illustration which shows such fur or fur product to be a higher priced product than the one so advertised.
"(g) No person shall, with respect to a fur or fur product, advertise such fur or fur product as being 'bankrupt stock', 'samples', 'show room models', 'Hollywood Models', 'Paris Models', 'French Models', 'Parisian Creations', 'Furs Worn by Society Women', 'Clearance Stock', 'Auction Stock', 'Stock of a business in a state of liquidation', or similar statements, unless such representations or claims are true in fact."

31. "2. Represents directly or by implication:

The claimed insufficiency of the evidence to support this finding will be treated further on in the Opinion. For the present we advert to the contention that the Act does not prohibit misrepresentations as to prices and that the Commission in enacting Rule 44,[32] exceeded its statutory powers.

■■ Our answer is that the Commission in enacting this rule correctly interpreted and carried into effect the intent of the Congress in passing the Act. It is obvious from the legal discussion which precedes that there is no constitutional inhibition against regulating purely local activities if, in the opinion of the Congress, they have a deleterious effect on the commerce between States.

The object of the Act under discussion is to make unlawful

"the introduction, or manufacture for introduction, into commerce, or the sale, advertising or offering the sale in commerce, or the transportation or distribution in commerce, of any fur product which is misbranded or falsely or deceptively advertised or invoiced." [33]

The title of the Act and the subtitles to its various subdivisions indicate plainly that one of the evils sought to be stamped out is the *advertising* along with introduction into commerce, manufacture for commerce and sale in commerce. Not

only the specific acts codified as sections 69 to 69j of the Title, but also the rules and regulations to be prescribed under Section 69f(b) are declared to be

"an unfair method of competition, and an unfair and deceptive act or practice, in commerce under the Fair Trade Commission Act." [34]

The Act vests the Commission with the power to enforce these sections

"by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated into and made a part of this Act." [35]

In addition to this, Subdivision (b) of the same Section provides:

"The Commission is authorized and directed to prescribe rules and regulations governing the manner and form of disclosing information required by Sections 69–69(j) of this title, and such further rules and regulations as may be necessary and proper for purposes of administration and enforcement of said sections." [36]

The petitioners ask us to apply narrowly the doctrine of *ejusdem generis* as expounded in some state cases,[37] so as to limit the power of the Commission to the subjects actually covered by the Act. Because the Act does not speak of misrep-

---

"(a) That the regular or usual price of any fur product is any amount which is in excess of the price at which respondents have usually and customarily sold such products in the recent regular course of their business;

"(b) That a sale price enables purchasers of fur products to effectuate any savings in excess of the difference between the said price and the price at which comparable products were sold during the time specified or, if no time is specified, in excess of the difference between said price and the current price at which comparable products are sold;

"(c) That an amount set forth on price tags, or otherwise relating or referring to fur products, represents the value or the usual price at which said fur products had been customarily sold by respondents in the recent regular course

of their business, contrary to fact;

"(d) That any such product is of a higher grade, quality, or value than is the fact, by means of illustrations or depictions of higher priced or more valuable products than those actually available for sale at the advertised selling price, or by any other means."

32. Rule 44, 16 C.F.R., 1949 ed., Supp. § 301.44.

33. 15 U.S.C.A. § 69a (a).

34. 15 U.S.C.A. § 69a (a).

35. 15 U.S.C.A. § 69f (a) (2).

36. 15 U.S.C.A. § 69f (b).

37. State v. Thompson, 1950, 38 Wash.2d 774, 232 P.2d 87; Smith v. Higinbothom, 1946, 187 Md. 115, 48 A.2d 754.

resentation as to *price and value,* we are urged to find that the Commission was without power to promulgate Rule 44, which specifically prohibits various forms of misrepresentations as to prices.

 The Supreme Court of the United States has laid down rules for the interpretation of federal statutes. These are explicit, and are binding on us. So we need not, indeed we are not free, to resort to state decisions in interpreting a federal statute. The rule of *ejusdem generis,* as applied by the Supreme Court, has been succinctly stated by Mr. Chief Justice Hughes in this manner:

> "The rule of *ejusdem generis* is a familiar and useful one in interpreting words by the association in which they are found, but it gives no warrant for narrowing alternative provisions which the legislature has adopted with the purpose of affording added safeguards. 'The rule of "ejusdem generis" is applied *as an aid in ascertaining the intention of the Legislature, not to subvert it when ascertained'.* State of Texas v. United States, 292 U.S. 522, 534, 54 S.Ct. 819, 825, 78 L.Ed. 1402." [38] (Emphasis added.)

In the case in which this statement was made, it was argued that an act [39] dealing with fraud against the Government should be limited to cases involving pecuniary or property loss. The Court declined to apply the narrow rule of construction and held that the presentation of *any* false statement was punishable by the Act whether it resulted in loss to the Government or not. This accords with a concomitant rule that

> "The policy as well as the letter of the law is a guide to decision." [40]

The object of the statute before us— as appears from the legislative history,[41] was to prevent, among other things, false advertising of fur products or furs, *no matter to what it related.* There is no rigid requirement of semantic perfection in the use of words by the Congress. All that is required is that the Congress make

> "a choice of language which fairly brings a given situation within a statute." [42]

As stated by the Supreme Court in another case:

> "Words generally have different shades of meaning and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed." [43]

38. United States v. Gilliland, 1941, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598.

39. 48 Stat. 996, 18 U.S.C.A. §§ 287, 1001.

40. Markham v. Cabell, 1945, 326 U.S. 404, 409, 66 S.Ct. 193, 195, 90 L.Ed. 165. See, Cox v. Roth, 1955, 348 U.S. 207, 208–210, 75 S.Ct. 242, 99 L.Ed. 260.

41. Congressional Record, February 22, 1950, p. 1510, June 18, 1951, p. 6850; Hearings on H.R. 3734, before the Committee on Interstate and Foreign Commerce, House of Representatives, 80th Congress, 2d session, April 7, 1948, pp. 141–146; Hearings on H.R. 97 and H.R. 3755, before a Subcommittee of the Committee on Interstate and Foreign Commerce, House of Representatives, 81st Congress, 1st session, May 11, 12, 13, 1949, pp. 37, 55–56, 194–200; Hearings on H.R. 2321, before the Committee on Interstate and Foreign Commerce, House of Representatives, 82d Congress, 1st session, April 17, 20, 1951, pp. 12–14, 160; Senate Committee on Interstate and Foreign Commerce, 82d Congress, 1st session, Febuary 5, 1951, Report No. 78; Committee on Interstate and Foreign Commerce, House of Representatives, 82d Congress, 1st session, June 11, 1951, Report No. 546.

42. Barr v. United States, 1945, 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765.

43. People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 258, 58 S.Ct. 167, 169, 82 L. Ed. 235. And see, United States v. Turley, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed. 2d 430.

The word "price" does not occur in the section of the Act under consideration relating to false advertising.[44] However, the Section declares fur products or furs to be falsely or deceptively advertised if an advertisement, representation, public announcement or notice which is intended to aid, promote, or assist, directly or indirectly, in the sale or offering for sale of such fur product or fur among other facts given or omitted,

> "(5) contains the name or names of any animal or animals other than the name or names specified in paragraph (1) of this subsection, or *contains any form of misrepresentation or deception, directly or by implication, with respect to such fur product or fur.*" [45]

It is evident that the last portion of this clause, *which we have italicized,* covers misrepresentations relating to other matters than the name or names of animals; otherwise it would be meaningless. For after specifying names of animals this provision prohibits specifically "any form" of misrepresentation or deception relating to *"such fur product or fur".* If the misrepresentations or deceptions which the Congress had in mind were misrepresentations *kindred* to names of animals, it would have used the words "with respect to such name or names". The use of the phrase "with respect to such fur product or fur" is proof that the clause meant to cover other representations than those relating to names, which were mentioned in the first paragraph of this subsection. Perhaps better grammatical construction might have required the placing of this clause in a separate paragraph at the end of this portion of the section. But we cannot destroy its

obvious meaning because, in the slow and arduous process of the enactment of the statute, a clause which has a distinct meaning was inserted in the wrong place. Neither rules of grammar, punctuation nor syntax are decisive of the construction of a statute, if their strict observance would render ineffective any portion of it.[46] Because of this the Supreme Court has stated:

> "It has often been said that punctuation is not decisive of the construction of a statute. * * * Upon like principle we should not apply the rules of syntax to defeat the evident legislative intent." [47]

Some years ago this court, speaking through the late Wm. H. Sawtelle, Circuit Judge, expressed this thought in language which is both colorful and meaningful:

> "There is only one remaining basis for the contention of appellant on grammatical grounds that the opening phrase, 'within five years after entry,' is applicable to the classification under which he falls. That basis would be the closely related field of rhetoric, but it is neither the province nor the desire of this court to set itself up as an academy of letters to rule on questions of style. It may be admitted that the language of many statutes might be improved upon, but, so long as that language follows certain well-established rules of grammar, it is not our duty to judge it by its nicety of phraseology." [48]

More recently, this Court was called upon to determine whether the penalty in an amendment to the Immigration and Naturalization Act applied to a person who transports within the United States

44. 15 U.S.C.A. § 69c.

45. 15 U.S.C.A. § 69c(a) (5).

46. 82 C.J.S. Statutes §§ 340–341.

47. Costanzo v. Tillinghast, 1932, 287 U.S. 341, 344, 53 S.Ct. 152, 153, 77 L.Ed. 350. As said in United States v. Shreveport Grain & Elevator Co., 1932, 287 U.S. 77, 82–83, 53 S.Ct. 42, 44, 77 L.Ed. 175:

"Punctuation marks are no part of an act. To determine the intent of the law, the court, in construing a statute, will disregard the punctuation or will repunctuate, if that be necessary, in order to arrive at the natural meaning of the words employed."

48. McLeod v. Nagle, 9 Cir., 1931, 48 F.2d 189, 191.

an alien who is illegally in the United States.[49] The section punishes several acts. It was argued that, because of the arrangements of the Section, there *was no penalty* for transporting an alien. While conceding that grammatically the Section might be incorrect, this Court held that the statute, *construed as a whole,* in the light of the purpose sought to be achieved, should be given effect in every one of its parts, and that the penalty should apply to *"any person"* doing any of the acts, although, at first glance, the statute made it uncertain whether the word "he" referred to the alien or to one who transports him or to both. The court said:

> "While the verbal arrangement of the statute may be thought awkward, we are of opinion that a reading of it as a whole in light of the congressional declaration of purpose leaves no rational doubt as to what was intended. That part of subsection 8 (a), ending with the word 'who,' specifies the persons whose activities are the subject matter of the legislation. Paragraph (1) following relates to the activity of smuggling aliens into the United States; paragraph (2) to the transportation of aliens within the United States by one who knows they are unlawfully here and who knows or has reason to believe that the alien's last entry occurred within three years prior to the transportation; paragraph (3) to the concealing, harboring or shielding of aliens unlawfully in the United States; and the first part of paragraph (4) is aimed at those who aid, abet or encourage the smuggling of aliens into this country. Except for the proviso at the end of para-

graph (4) the whole of the subsection constitutes a single sentence, divided into paragraphs which are in the interest of clarity separated from each other by semicolons. The penalty provision is not separately stated in the paragraphs but is set forth in the last. The several types of conduct banned are all made subject to the same punishment there specified, namely, fine or imprisonment 'for each alien in respect to whom any violation of this subsection occurs'. The words 'this subsection' can only refer to subsection (a). Thus it is manifest that the 'he' and 'his' of paragraph (2) refer to the phrase 'any alien', which finally shows up in paragraph (4) after the several prohibited activities in respect of the alien have been specified." [50]

We have a similar situation here where, in a regulatory statute, the aim of which is to protect commerce between the states, by, among other things, preventing false advertising of fur products or furs, a general clause prohibiting deceptive advertising practices *other than those enumerated* instead of being placed *after* the ultimate clause and made a separate clause is put in as a part of the penultimate clause. As already appears, the whole section spells out certain particular falsities in advertising. The particular clause prohibits *other misrepresentations as to fur products or furs.* To relate it merely to names would render it meaningless. By applying the principles in the cases just cited, and taking into account the legislative history of the Act, it is quite evident that the intention was to reach *all misrepresentations in advertising,* including those relating to prices

49. 8 U.S.C.A. § 1324(a) (2).

50. Herrera v. United States, 9 Cir., 1953, 208 F.2d 215, 217. See, Perko v. United States, 8 Cir., 1953, 204 F.2d 446, 447–448, in which the Court rejected a narrow application of the rule of *ejusdem generis,* which would have rendered meaningless the words "or other governmental purposes" in a section of the Air

Commerce Act of 1926, relating to the power of the President:
"* * * to provide by Executive order for the setting apart and the protection of airspace reservations in the United States for *national defense* or *other governmental purposes* and, *in addition,* in the District of Columbia *for public safety purposes."* 49 U.S.C.A. § 174. [Emphasis added.]

and value. If any doubt exists about the matter the clause under consideration indicates the intention to include them. The Commission was right in so interpreting the statute and acted within its powers in promulgating the rule under discussion.

## IV.

### Were the Petitioners in Commerce?

 In the light of what precedes, the disposition of the remaining questions presents no great difficulty. The Commission was right in holding that the petitioners advertised in commerce.[51] Eight specific sales (two to the same person) of furs destined for delivery outside California between September 29 and December 18 of one year were testified to by De Gorter. The fact that some were sold on time payments to persons not residing in the State and that no California sales tax was collected, the invoices stating "Export" or "Out of State", dispels any thought that this was done merely to accommodate the customer.

De Gorter also testified that there were, in addition to the enumerated sales, a few other out-of-state sales. He did not say what "a few" meant. Advertisements were placed in two Los Angeles newspapers which have circulation outside California. And De Gorter admitted that "approximately" 25 per cent of his fur products were shipped into the State by New York manufacturers. As these importations were continued over a long period of years, there is present *a constant flow* of goods in commerce which, by itself, would justify the finding of the Commission.[52]

The sales to persons residing outside California, the advertising in newspapers of interstate circulation, and the out-of-state origin of approximately one-fourth of the products sold, taken together, establish the fact that the petitioners were engaged in interstate commerce as that term is defined in the special Act under consideration and in the Federal Trade Commission Act.[53] Both from a legal and social standpoint, an interpretation that would eliminate false advertising as to value and price at a local level, from the evils which the special Act sought to eradicate, would render it ineffective. Such exclusion would open the door to the type of advertising which is most harmful—a type of advertising which, as will appear further on in the discussion—was characteristic of that carried on by the petitioners. In these days when, through the various media of communication, advertising has so important a part in promoting a wider sale and distribution of products on which the productivity and the well-being of the American economy depend, misrepresentations as to value and price are more likely to have a harmful effect on interstate commerce than misbranding or false invoicing.

All these reasons converge in calling us to reject the narrow interpretation which the petitioners would have us place upon the statute in question in order to avoid the consequences of a type of advertising of prices which the Commission characterized in its findings as "fictitious." This brings us to a consideration of the last point—whether the facts in the record warrant the finding that the advertisements were false as to prices.

51. We are bidden to give great weight to the interpretation of the Commission; Unemployment Compensation Commission of Territory of Alaska v. Aragan; 1946, 329 U.S. 143, 152, 67 S.Ct. 245, 91 L.Ed. 136.

52. United States v. Food & Grocery Bureau, D.C.Cal.1942, 43 F.Supp. 974, 975; United States v. Standard Oil Co. of California, D.C.Cal.1948, 78 F.Supp. 850; McComb v. Dessau, D.C.Cal.1950, 89 F. Supp. 295, 296.

53. 15 U.S.C.A. § 44. See, Fox Film Corp. v. Federal Trade Commission, 2 Cir., 1924, 296 F. 353; Binderup v. Pathé Exchange, 1923, 263 U.S. 291, 309–310, 44 S.Ct. 96, 68 L.Ed. 308. And see, Amalgamated Meat Cutters, etc. v. Fairlawn Meats, 1957, 353 U.S. 20, 77 S.Ct. 604, 1 L.Ed.2d 613; Guss v. Utah Labor Relations Board, 1957, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601; San Diego Bldg. Trades Council v. Garmon, 1957, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618.

## V.

### The Falsity of the Advertising

A study of these advertisements, in the light of the testimony introduced at the trial, compels the conclusion that the finding in this respect is sustained by substantial evidence on the record considered as whole.[54] Indeed, an analysis of the exhibits, in the light of De Gorter's own testimony shows that they were blatantly false. One advertisement speaks of

> "Tremendous Inventory
> 1000 Selected Furs
> Priced Regardless of Cost!"

Another uses this phraseology:

> "Tremendous Inventory of Selected Furs
> Priced Regardless of Cost!"

Each of these advertisements listed high, *apparently* former prices ("values up to"), and reduced prices ("now"), giving but a fraction, in some instances a third, of the alleged value. They need not be given in detail here. Some of them will be referred to further on. A third advertisement reads:

> "Pelta Fur consolidates with famous
> wholesale mink manufacturer
> More room required!
> complete stock $250,000.00 exquisite
> styles now on Sale ½ price
> present unchanged price tags remain
> on garment
> You May Deduct One-Half!!!"

De Gorter, by his own testimony and admissions, demonstrated the falsity of these representations. His very pricing system had the badge of deceit in it. He objects to the finding that the prices were "fictitious." The word does not appear in the Act, but it is in the Regulation.[55] By applying it to the facts in the case, the Commission sought to indicate that the entire system of pricing was so arranged that the customer was given the false impression that he was purchasing either a fur at a reduced price, *percentagewise* or *otherwise*, when, in reality, *no price ticket represented the actual price* at which the garment *was required* to be sold by any salesperson.

"Fictitious" means founded on fiction, having the character of a fiction; false, feigned, or pretended.[56] Each of the last three adjectives could be applied to this method. On each garment there were three prices: a ticketed top price written in dollars and cents, fixed arbitrarily by the petitioners. To guide the salesperson, two additional prices, *in code,* were placed upon the tag—at either of which the fur could be sold, the percentage of the salesperson's commission depending on the price secured. The ticketed price was merely a *bargaining* price, of the type which characterizes oriental huckstering.

On one date the petitioners' books reflect nine sales of which *only one* brought the ticketed price. The others were at either the second or the third code price. De Gorter admitted that, on the whole, he received the ticketed prices in not more than ten percent of his sales. *Not one of the prices had any systematic relation to cost or was set up on a definite pattern of profit.*

The advertisements trumpeted widely to the prospective customers that they were buying furs of a higher value at a reduced price "regardless of cost" or "at half price." The salespeople re-echoed these statements.

As already appears, the ticketed price was merely the highest price that the petitioners had placed on the garment, which when reduced by the salesperson to the coded prices, led the customer to believe that he was "picking up" a bargain which, in reality he was not.

---

54. 15 U.S.C.A. § 45(c); 5 U.S.C.A. § 1009 (e). And see cases cited in Notes 7 to 12 supra.

55. 16 C.F.R., 1949 ed., Supp., § 301.44.

56. Kropp Forge Co. v. Employers' Liability Assur. Corp., Ltd., 7 Cir., 1949, 159 F.2d 536, 538. This definition accords with that in Webster's New 20th Century Dictionary, 1951 ed., which the petitioners cite in their brief.

We particularize by referring to some sales as to which De Gorter testified. In one instance, the advertised value of $189 appeared on the price tag, but the *supposedly reduced* figure $68 appeared only *in code*. In another instance mink coats had a ticketed price of $895 which was represented in the advertisement as the *value* of the garment. It was sold and shipped to Ohio at $488, the only coded alternative price the garment had.

As to the "half price sales" touted from another advertisement, the evidence shows that a plainly *arbitrary* price was put on the tickets and the customer informed that *he could halve it*. There is no evidence that any of the garments *ever had* the full value claimed for them or that they were intended to sell or had been offered for sale at the higher price. Equally unreliable were the statements as to the relation of price to cost. The phrases used were "discount sale," sales "many at cost," "below cost," "regardless of cost," "at a fraction of original price," "actually below wholesale."

The testimony showed that, as to one item which cost $150, the ticketed price was $298 and the garment was sold for $300, including tax. On another item, of which the purchase price was $69.50, the ticketed price was $249 and the two coded prices were $159 and $198. The garment was actually sold for $163.77, i. e. $159 and the tax. A third item cost $49.50, the ticketed price was $198 and the coded prices $149 and $98. De Gorter did not know what it sold for. So these sales were not "below" or "at cost," or sold "regardless of cost," as the advertisements claimed.

The deceptive character of these advertisements is also illustrated by the fact that when an advertisement stated, for instance, that a garment worth up to $295 was now priced at $150, the ticket price on the supposedly advertised garment *was not changed* to conform to the advertisement. The customer could not, therefore, identify the advertised product. As De Gorter testified, he might be shown a fur that had a mark of $298 on the ticket and be told he could buy it for $149. One of the advertisements stated:

"Complete stock now on sale, half price, present unchanged price tags remain on garments, you may deduct one-half."

In the interrogation as to it before the Hearing Officer, De Gorter was asked:

"Were you selling all of your merchandise at that time at one-half of your plainly-ticketed price?"

His answer was:

"No sir, it was indicated exactly in numbers how many and what was sold. It says here 25 beautiful coats and jackets and the type of fur, it says here how many stoles, capes, and the different types, 150 stoles and so on, the different types."

■ Here again, we have insidious and insinuative language, conveying a false impression, and the attempt to evade its *probable* and, we may assume, *intended* effect. For the reader of the advertisement would receive the impression that the "entire" stock of the establishment was being liquidated. He would consider the enumeration of items as particularizing some of the "bargains" that could be picked up. De Gorter tried to defend his method as a practice which obtains locally in the trade and which was forced on him by various month-end and other methods of sales resorted to by other furriers. But no such rationalization can justify the practice. Nor is a Commission charged with preventing unfair and deceptive practices in commerce required to tolerate them because they may be accepted in a definite locality.

Indeed, it is against this type of deception that the Federal Trade Commission Act and the special Fur Products Labeling Statute and the regulations under it were directed.

■ In this field of the law, it is not necessary that the advertising be, *in fact*, misleading. If it has a tendency to mislead, it is within the power of the Commission to interdict. A case which arose under the 1950 amendment to Section 15

of the Federal Trade Commission Act,[57] can readily be applied to the situation before us, especially in view of the fact that the Commission here found violation of that Act also. A section of the latter Act makes it unlawful to disseminate or to cause to be disseminated

"any false advertisement—\* \* \* for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase of food, drugs, devices, or cosmetics; "[58]

A seller of a product called "Reddi-Spred" which, under the statute, is a margarine,[59] issued advertisements which without actually claiming that the product was butter, so interwove the word "butter," *in bold face,* with the phrasing of the advertisement, that it clearly gave the impression that a *butter product* was involved. In sustaining the action of the Commission which declared the advertising to be false and deceptive under the statute, the Court of Appeals for the Third Circuit used this language:

"The issue before us is not whether the advertisements of Reddi-Spred have the tendency or capacity to deceive the purchasing public into believing that it is in reality a dairy product or something sold under a trade name which is actually different from oleomargarine. Nor does the Commission contend there is no butter in Reddi-Spred. It does

justifiably decide that the shrewd featuring of the word butter in the advertisements coupled with skillfully worded statements which infer that because of its butter content Reddi-Spred is substantially different from margarine suggests that Reddi-Spred is a dairy product and so violates the letter and spirit of the statute. With the advertisements before us it is impossible to say that the Commission's finding is arbitrary or clearly wrong." [60]

The special statute before us aims to protect interstate commerce from false advertising relating to fur products and furs. The advertisements under consideration here were alluredly false. For they conveyed the false impression that the purchaser was benefiting from reductions in prices.

As already appears, the sales were neither at a reduction from (a) a price at which the fur product or a similar product sold before, nor were they at (b) half price or (c) below cost.

In viewing the cease and desist order of this and other regulatory agencies, the decisions teach that the test of the proper scope of an order is

"whether the Board might have reasonably concluded from the evidence that such an Order was necessary." [61]

In dealing with matters of this character, the Courts reject the rule of *caveat emptor* and insist that the fact that the careful reader of the advertisement might detect their true nature presents no obstacle in enforcing orders of the Commission directed at false and deceptive practices: Federal Trade Commission v. Standard Education Society, 1937, 302 U.S. 112, 116, 58 S.Ct. 113, 82 L.Ed. 141; and see, Book-of-the-Month Club, Inc., v. Federal Trade Commission, 2 Cir., 1953, 202 F.2d 486.

57. 15 U.S.C.A. § 55(a) (2).

58. 15 U.S.C.A. § 52(a) (1).

59. 15 U.S.C.A. § 55(f).

60. Reddi-Spred Corp. v. Federal Trade Commission, 3 Cir., 1956, 229 F.2d 557, 559. Indeed, as stated very recently by the Court of Appeals for the Second Circuit, the Commission *may draw on its own experience:*

"The Commission, which is deemed to have expert experience in dealing with these matters, Federal Trade Commission v. R. F. Keppel & Bro., Inc., 1934, 291 U.S. 304, 314, 54 S.Ct. 423, 78 L.Ed. 814, is entitled to draw upon its experience in order to determine, in the absence of consumer testimony, the natural and probable result of the use of advertising expressions." E. F. Drew & Co. v. Federal Trade Commission, 2 Cir., 1956, 235 F.2d 735, 741.

61. May Dept. Stores Co. v. National Labor Relations Board, 1945, 326 U.S. 376, 390, 66 S.Ct. 203, 211, 90 L.Ed. 145; and see, Federal Trade Commission v. National Lead Co., 1956, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438.

■ We are of the view that the Commission reached such reasonable conclusion in issuing the Order to Cease and Desist before us.

It follows that the Order should be and is hereby affirmed.