## Case No. 9,742.

### MOODIE v. The BETTY CARTHCART.

[Bee, 292; [1] 3 Dall. 288, note.]

District Court, D. South Carolina. April 27, 1795.

NEUTRALITY LAWS—EQUIPMENT—WHAT EVIDENCE TO BE FIRST TAKEN.

1. What equipments in our ports amount to a breach of neutrality.

[Criticised in Stoughton v. Taylor, Case No. 13,502.]

2. Evidence to acquit or condemn must in the first instance come from the vessel taken, the persons on board, and the examination on oath of the master and other officers.

In admiralty.

BEE, District Judge. The cause before the court, and in which I am now about to pronounce my decree, is a cause of considerable importance, as well with respect to the circumstances of the case, as the value of the property. It will not be necessary for me to recite at length the whole of the pleadings, and arguments that have been adduced. The facts stated in the libel, are partly admitted, and partly denied. The capture of the Betty Carthcart, on the high seas, out of the jurisdictional limits of the United States, and the property of the vessel and cargo as belonging to British subjects, are admitted on all hands. It is admitted also, that at the time of the arrival of the Citizen of Marseilles, in Philadelphia, she was an armed ship, and had a commission to cruize against the enemies of France. An exception was taken to the commission on two grounds: 1. That all the commissions issued by Santhonax and Polverel, had been recalled. 2. That the certificate from Mr. Petry, the consul at Philadelphia, was only conditional. The only points, then, which it is necessary for me to investigate, are: 1. Whether the force of this vessel was increased and augmented within the limits of the United States. 2. Whether such increase is a breach of the laws of neutrality and nations: and 3. What is required by the laws of neutrality in such cases, or whether the 17th article of the

treaty is a suspension thereof as to the United States.

On the first part, viz. whether the force of the Citizen of Marseilles was increased and augmented within the United States. A number of witnesses have been examined, and a variety of other evidences adduced. The proofs in this cause have been very properly divided by one of the counsel, into four classes or sets. I will, therefore, consider them in that order also: The proofs which relate to the vessel at Cape François, before she sailed for Philadelphia. 2. Those which relate to her whilst at Philadelphia. 3. Those after she left the city, and previous to her going to sea. 4. Those immediately after she got to sea.

To the first point, Mr. Boisseau only speaks of her as an armed vessel generally, to the month of June 1793, but does not specify any particulars. W. Charrie, who was on board two days, about this period, speaks of her as an armed vessel, with ten ports on each side, and guns in them, and also as having guns in her hold—but no particular number. These are the only witnesses to this point.

If we proceed now to her appearance at Philadelphia, we find a contrariety of evidence. General Stewart, in his letter to the collector, 3d of September, 1794, mentions her as having at her arrival sixteen nine, and ten six pounders; but he does not say whether they were mounted or not. He says she will only mount twelve guns at going out, and carry the others in her hold. In his letter to the secretary at war, dated the 14th October, 1794, he refers to the above, and also states the different reports of Mr. Milnor, one of the deputy inspectors of the port, to him. The first, on the 30th of September, 1793. He adds, that the ship arrived last autumn, with sixteen nine, and ten six pounders, but will only mount twelve guns, which she brought in that situation—the others she is to carry in her hold. On the 14th of October, General Stewart visited her again, and says he finds no addition to the armament, she was reported, and had, on her arrival, viz. ten six pounders on her main deck, and two on her quarter deck, and the rest of the guns in the hold. No new ports had been opened since her arrival. General Stewart does not say who reported her thus on her arrival. It could not be Mr. Milnor, for he, on the 14th of October, in his report, says, "Having examined the ship called the Citizen of Marseilles, on her arrival in port, I again examined her this day, and find no addition to her armament, &c." The same number of guns are mentioned, that she had on her arrival. His other certificate which appears from General Stewart's letter to be dated on the 30th of September, 1793, and made to him, of the then actual armament of the ship that day, the day of her arrival—says—"boarded the privateer ship the Citizen of Marseilles, commanded by Planche, twelve six pounders mounted and three not

mounted, with other warlike apparatus—forty-six men." By comparing the dates and extracts in this exhibit, it plainly appears there is some mistake amongst the officers at that port. Mr. Milnor, on the 30th of September, 1793, the day she arrived, boarded her, and says she had twelve six pounders mounted, and three not mounted: he also visited her on the 14th of October 1794, and found no addition to her armament, the same number of guns being mounted. This evidence from the report of the officers of the port, clearly proves, that the ship, on her arrival, had only twelve guns mounted—how many others there were on board not mounted, must be left to the officers to settle, as I cannot do it from the evidence adduced. Mr. Harrison also fixed to ten on her main deck, and two or four on her quarter deck. Michael Williams says, she had but five of a side on her main deck, and two on her quarter deck. John Grenion, who sailed in the vessel from the Cape to Philadelphia, says she had only five of a side on the main deck, and one on each side on the quarter deck, and that there were no more port holes open than guns. Captain Montgomery, of the revenue cutter, who saw her at a distance at her first arrival, supposed her to have ten ports of a side, but whether all real, or some painted, he could not say. From the whole of this evidence, then, it clearly appears to me, that the ship, at her arrival, had only twelve guns mounted, and none in her hold. If we now advert to the number of ports which were open either at her arrival, or at her leaving the port of Philadelphia; we find she had the same number as of guns mounted. All the evidences who were near her, swear positively, that there were none abaft the main chains—though several say the ports were framed within, but planked over on the outside. Harrison's evidence is conclusive—because he mentions his application to the governor for permission to open more ports, which was refused; and Captain Chabert's reply that he did not wish to go contrary to the laws of the country, and that as he had carpenters of his own, he could open them elsewhere, and at another place, is fully sufficient to fix this point.

The third class of evidence, is such as relates to the vessel after her leaving the city, and previous to her proceeding to sea. And from a careful revision of this it does appear, that a number of ports were opened, and guns mounted in the river Delaware. Quin swears positively to fourteen. Powel says there were three carpenters at work to cut the ports through, and fit them—himself, Stevenson and another; and that each took one for a day's work. It could not therefore take more than five days to effect this, and from the latter end of October to the 4th of November, there was sufficient time to complete it. The evidence of these two witnesses has been impeached in several particulars, but it really appears to me, that there are so many proofs and circumstances stated, that corroborate their testimony to most of the points they speak of, that there is not sufficient ground for me to repel the evidence they have given in toto. The witnesses who prove the increase of force in the river, are Quin, who says she mounted twenty-eight guns—Captain Montgomery says twenty-six or twenty-eight. Mr. Kevan says, a whole tier fore and aft. All then speak of the vessel down the river, and before she went to sea.

The fourth and last class is that relative to her, immediately after her going to sea. One of the counsel for the claimant objected to the testimony of all the witnesses on board the prize, as being interested, and of course incompetent, but he could not be serious in this, because the constant uniform practice of the civil law courts has been to admit such evidence to certain points. In Collectanea Juridica (page 135), is the famous case so often resorted to as fixing the law. In this case, it is expressly laid down, that the evidence to acquit or condemn, must, in the first instance, come from the vessel taken, the persons on board, and the examination on oath of the master and other officers. The evidence they all give is reducible to two points. 1st. The appearance and force of the ship both as to guns and men. 2d. The intelligence obtained from the crew. As to the last, I think little attention should be paid to the chit chat on board one of these privateers; and very frequently the witnesses do not understand the language they hear spoken, and report from second hand: but they certainly are competent witnesses as to the number of guns and crew that were on board at the time of the capture; and in this they all agree, that she mounted twenty-eight guns, when she took the Den Onzekeren, out of which she took two guns to make thirty, and several of them say, she could mount thirty-four guns, having ports cut for that number. Captain Raymon Sanchez, captain of the brig Dichoso, taken on the 6th of November, two days after the vessel left the Delaware, says she mounted twenty-eight. Lemuel Janson, of the Den Onzekeren, says she mounted twenty-eight guns. Jacob Vix, a sailor on board the Dutch ship, says the same. John Hallrick, seaman on board the Betty Carthcart, says the same. Charles M'Donald, mate of this ship, says she had twenty-eight guns on the 11th of November, when they took him. Hans Evertson, mate of the Den Onzekeren, taken the 16th of November, says she had then twenty-eight guns mounted. Adrianus Pappagaay, the doctor of the Dutch ship, says she had twenty-eight guns. Here then is such concurrent testimony of the increased force of this vessel, that it is impossible not to admit it; and if admitted, it carries with it the most unequivocal proof that the ship the Citizen of Marseilles, did increase her force of guns

mounted, and prepared for use within the territory of the United States:—There was no positive proof as to the new gun carriages being actually carried on board; neither was there any of their being on board when she first arrived. Mr. Harrison mentions the repairing of some, and where old ones were rotten the replacing them. If this was solely for those guns that were actually mounted at her arrival, I see nothing against it. It could not be called an augmentation of her force— neither is there any evidence sufficient to convince my mind that the crew of the Citizen of Marseilles, at her going out was increased, or if increased, in any way that could be said to infringe our neutrality. Though some of the evidences say they were not all native Frenchmen from their language, yet they all agree that the strength of the crew were so, the others were a mixture, there is no proof of any one American citizen being on board, unless Quin was; as to other nations, I know of no right we have to control their seamen. The 27th article of our treaty with Holland [8 Stat. 48], which, by the 3d article of the treaty with France [Id. 14], in my opinion is confirmed to them also, admits the carrying away seamen or other natives or inhabitants of the respective nations on board of any of their vessels, whether of merchandise or war.

From a careful review of the evidence produced in this cause, it appears clearly to me that the ship Citizen of Marseilles, at her arrival in Philadelphia, mounted only twelve guns, and had others, but the precise number is not ascertained, in her hold: that at the time of her leaving the river, she had twenty-six or twenty-eight mounted: that Captain Chabert having been refused permission to open new ports in Philadelphia, and declaring he did not wish to infringe the laws, and having afterwards done so within the territories of the United States, could not and does not plead ignorance as an excuse. Whatever he did was with his eyes open, and being forewarned, he must abide the consequences.

It remains now for me to inquire into the law arising from the foregoing facts, and the power and duty of this court thereupon. There cannot be a doubt that if a prosecution was instituted against Captain Chabert, or any of the persons concerned in increasing, augmenting, or procuring to be increased or augmented, the force of the vessel, under the act of June 5, 1794 [1 Stat. 383], but that a conviction must follow. There a penalty of fine and imprisonment is declared, as a punishment for a breach of the sovereignty and neutrality of the United States, and this by a municipal law of our own: but what does the law of nations require further? I have in the course of the last summer, delivered my opinion on this question so fully in this court, that I need only now repeat some part of the law then laid down. In the case of Janson v. Talbot [unreported], I stated that

this court, by the law of nations, has jurisdiction over captures made by foreign vessels of war, of the vessels of any other nation, with whom they are at war, provided such vessels were equipped here, in breach of our sovereignty and neutrality, and the prizes are brought infra praesidia of this country. By the law of nations, no foreign power, its subjects or citizens, has any right to erect castles, enlist troops, or equip vessels of war in the territory or ports of another. Such acts are breaches of neutrality, and may be punished by seizing the persons and property of the offenders. Vessels of war so equipped, are illegal ab origine, and no prizes they make will be legal as to the offended power, if brought infra praesidia. The seizure and restoration of such prizes are what the laws of neutrality justly claim. You must either permit both parties to equip in your ports, or neither. Should either equip without your consent, the least you can do, is to divest them of the prizes they may have thus illegally taken, and restore them to the other party, or else permit them to equip also. This cause and this decree were submitted to the circuit court in October last, and there affirmed. An appeal to the supreme court is still undetermined,[2] but until this opinion is overruled by that tribunal, I hold myself bound to consider it as a law. I gave a like decision lately, in the case of British Consul v. The Nancy [Case No. 1,898], from a full conviction that the principles I laid down formerly, were founded on the rules of propriety and the law of nations.