# Overview of the Neutrality Act

Overview of the Neutrality Act, focusing on explanations of certain key provisions, and summarizing various judicial and Attorney General opinions interpreting those provisions.

September 20, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum is intended to provide you with a broad overview of the Neutrality Act, 18 U.S.C. §§ 956 *et seq.*, its scope and applicability, and previous constructions of the various provisions of the Act by the courts, Attorneys General, and this Office.

Earlier this year, we provided you with our views regarding the applicability of the Act to official Government activities. "Application of the Neutrality Act to Official Government Activities," 8 Op. O.L.C. 58 (1984). That memorandum contains an extensive analysis of the legislative history of the various provisions of the Act, from 1794 when it was first enacted, through the several amendments to the Act, particularly those enacted in the nineteenth century. It also examines in significant detail several major judicial decisions construing the Act, as well as the opinions of various Attorneys General regarding the Act. In our earlier memorandum, we concluded that "the Act does not proscribe activities conducted by Government officials acting within the course and scope of their duties as officers of the United States but, rather, was intended solely to prohibit actions by individuals acting in a private capacity that might interfere with the foreign policy and relations of the United States." 8 Op. O.L.C. at 58.[1]

---

[1] However, as you are aware, the United States District Court for the Northern District of California recently held that the CIA's alleged covert "aid[ing], fund[ing] and participa[tion] in a military expedition and enterprises utilizing Nicaraguan exiles for the purpose of attacking and overthrowing the government of Nicaragua" could constitute a violation of 18 U.S.C. §§ 956 and 960, for purposes of triggering the investigation provisions of the Ethics in Government Act, 28 U.S.C. §§ 591, *et seq. See Dellums v. Smith*, 573 F. Supp. 1489, 1492 (N.D. Cal. 1983); *see also* 577 F. Supp. 1449 (N.D. Cal. 1984); 577 F. Supp. 1456 (N D. Cal. 1984). The Department appealed the district court's decision earlier this year, and is presently awaiting a decision by the United States Court of Appeals for the Ninth Circuit.

The only other current litigation of which we are aware in which the issue of the applicability of the Neutrality Act to Government officials is raised is in *Sanchez Espinoza v Reagan*, 568 F Supp. 596 (D.D C. 1983), *appeal pending*, No 83–1997 (D.C. Cir argued May 24, 1984). However, the District Court dismissed the plaintiffs' claims that the President, through his officers and appointees, had violated, *inter alia*, the Neutrality Act, the War Powers Resolution, 50 U.S.C. §§ 1541–1548, and the Boland Amendment to the Department of Defense Appropriations Act, 1983, Pub L. No. 97–377, § 793, 96 Stat. 1830, 1865 (1982), by waging an undeclared war against the Nicaraguan Government, on the ground that plaintiffs' claims presented nonjusticiable political questions.

* NOTE: After this opinion was issued by the Office of Legal Counsel, the United States Court of Appeals for the Ninth Circuit reversed the district court's decision in *Dellums v. Smith* on the ground that the plaintiffs lacked standing to bring the action. *See Dellums v. Smith*, 797 F.2d 817 (9th Cir 1986).

209

# I. The Neutrality Act

The provisions of the Neutrality Act, presently codified at 18 U.S.C. §§ 956 *et seq.*, remain substantially similar to the provisions originally enacted in 1794. *See* 1 Stat. 381.[2]

Section 958 makes it unlawful for any United States citizen to accept, within the jurisdiction of the United States, a commission to serve a foreign nation in a war against a country with which the United States is at peace.[3]

Section 959 prohibits anyone within the United States from enlisting or paying someone else to enlist him in the military service of a foreign state.[4]

Section 960 prohibits the knowing participation in, preparation for, or financing of a hostile expedition from within the United States against a nation with which the United States is at peace.[5]

Section 961 prohibits the outfitting of military vessels within the United States which are in the naval service of a foreign country engaged in war with a country with which the United States is at peace.[6] Finally, § 962 prohibits the

---

[2] There are several additional provisions of the neutrality laws which were not enacted until 1917. One provision, presently codified at 18 U.S.C. § 956, prohibits conspiring to injure the property of a foreign government with which the United States is at peace Section 956 provides in pertinent part:

> If two or more persons within the jurisdiction of the United States conspire to injure or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, or any railroad, canal, bridge, or other public utility so situated, and if one or more such persons commits an act within the jurisdiction of the United States to effect the object of the conspiracy, each of the parties to the conspiracy shall be fined not more than $5,000 or imprisoned not more than three years, or both.

The other provisions, enacted in 1917, codified at 18 U.S.C. §§ 963–967, deal with the detention in United States ports of armed vessels or vessels bound for belligerent nations until the owners certify to United States customs officials that the vessels will not be used in the military service of belligerent nations after departure from the United States.

[3] Section 958 provides:

> Any citizen of the United States who, within the jurisdiction thereof, accepts and exercises a commission to serve a foreign prince, state, colony, district, or people, in war, against any prince, state, colony, district, or people, with whom the United States is at peace, shall be fined not more than $2,000 or imprisoned not more than three years, or both.

[4] Section 959 provides in pertinent part:

> Whoever, within the United States, enlists or enters himself, or hires or retains another to enlist or enter himself, or to go beyond the jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince, state, colony, district, or people as a soldier or as a marine or seaman on board any vessel of war, letter of marque, or privateer, shall be fined not more than $1,000 or imprisoned not more than three years, or both.

[5] Section 960 provides:

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined not more than $3,000 or imprisoned not more than three years, or both.

[6] Section 961 provides in pertinent part:

> Whoever, within the United States, increases or augments the force of any ship of war . . . which, at the time of her arrival within the United States, was a ship of war . . . in the service of any foreign prince or state, or of any colony, district, or people, or belonging to the subjects or citizens of any such prince or state, colony, district, or people, the same being at war with any foreign prince or state, or of any colony, district, or people, with whom the United States is at peace, by adding to the number of the guns of such vessel . . . or by adding thereto any equipment solely applicable to war, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

210

outfitting or furnishing of any vessel within the United States with the intent that such vessel be used in the service of a foreign nation against a country with which the United States is at peace.[7]

## II. Judicial Decisions

The earliest judicial decisions construing the Neutrality Act involved the predecessors to §§ 961 and 962, which generally prohibit the arming of vessels in United States ports to be used in the service of foreign nations against nations with which the United States is at peace. The earliest cases generally were brought against private individuals who "outfitted" French ships engaged in hostilities with the British Navy. *See, e.g., United States* v. *Peters*, 3 U.S. (3 Dall.) 121 (1795); *United States* v. *Guinet*, 2 U.S. (2 Dall.) 321 (1795). *See also United States* v. *Skinner*, 27 F. Cas. 1123 (C.C.D.N.Y. 1818) (No. 16309); *The Betty Carthcart*, 17 F. Cas. 651 (D.S.C. 1795) (No. 9742); *The Nancy*, 4 F. Cas. 171 (D.S.C. 1795) (No. 1898). These early cases focused on what constituted the "arming" of a vessel, the distinction between "commercial" and "hostile" intent, and upheld the authority of the United States Government to define, as a matter of national policy, the political bodies in whose service, and against which, the prohibited acts had been committed. *See generally United States* v. *The Three Friends*, 166 U.S. 1 (1897). Moreover, these cases established that §§ 961 and 962 of the Act do not prohibit armed vessels belonging to citizens of the United States from sailing out of United States ports; rather the provisions require only that the owners of such vessels certify that the vessels will not be used to commit hostilities against foreign nations at peace with the United States. *See United States* v. *Quincy*, 31 U.S. (6 Pet.) 445 (1832). Finally, these cases recognized, with regard to §§ 961 and 962, the principle generally applicable to all of the neutrality provisions, that the preparations prohibited by the Act must have been made within the United States, and that the intention with respect to the hostile deployment of the vessel must have been formed before leaving the United States. *Id.*

The early decisions construing the Act, as well as subsequent judicial decisions, make clear that, in view of its purpose to prevent private citizens from interfering with the conduct of foreign policy by duly authorized Government officials, the Neutrality Act, particularly § 960, prohibits only "the use of the soil or waters of the United States as a base from which unauthorized military expeditions or military enterprises shall be carried on against foreign powers

---

[7] Section 962 provides in pertinent part:

> Whoever, within the United States, furnishes, fits out, arms, or attempts to furnish, fit out or arm, any vessel, with intent that such vessel shall be employed in the service of any foreign prince, or state, or of any colony, district, or people, to cruise, or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace; or

> Whoever issues or delivers a commission within the United States for any vessel, to the intent that she may be so employed shall be fined not more than $10,000 or imprisoned not more than three years, or both.

with which the United States is at peace." *United States* v. *Murphy*, 84 F. 609, 612 (D. Del. 1898). *See also Wiborg* v. *United States*, 163 U.S. 632 (1896); *United States* v. *O'Sullivan*, 27 F. Cas. 367 (S.D.N.Y. 1851) (No. 15974); *United States* v. *Smith*, 27 F. Cas. 1192 (C.C.S.D.N.Y. 1806) (No. 16342). The jury instructions in the *Murphy* case, which provide an extensive discussion of the elements of the "military expedition" offense under § 960, are illustrative of this point:

> Providing the means of transportation for a military enterprise to be carried on from the United States against Spanish rule in Cuba is, within the meaning of [§ 960] , . . . preparing the means for such military enterprise to be so carried on, and, if done with knowledge, on the part of the person so providing the means of transportation, of the character and purpose of such enterprise, is denounced by the statute. . . . The broad purpose of [§ 960] is to prevent complications between this government and foreign powers. . . . What it prohibits is a military expedition or a military enterprise from this country against any foreign power at peace with the United States.
>
>        *       *       *
>
> Where a number of men, whether few or many, combine and band themselves together, and thereby organize themselves into a body, within the limits of the United States, with a common intent or purpose on their part at the time to proceed in a body to foreign territory, there to engage in carrying on armed hostilities, either by themselves or in co operation with other forces, against the territory or dominions of any foreign power with which the United States is at peace, and with such intent or purpose proceed from the limits of the United States on their way to such territory, either provided with arms or implements of war, or intending and expecting . . . to secure them during transit, . . . in such case all the essential elements of a military enterprise exist. . . . It is sufficient that the military enterprise shall be begun or set on foot within the United States; and it is not necessary that the organization of the body as a military enterprise shall be completed or perfected within the United States. Nor is it necessary that all the persons composing the military enterprise should be brought in personal contact with each other within the limits of the United States; nor that they should all leave those limits at the same point. It is sufficient that by previous arrangement or agreement, whether by conversation, correspondence or otherwise, they become combined and organized for the purposes mentioned, and that by concerted action, though proceeding from different portions of this country, they meet at a designated point either on the high seas or

212

within the limits of the United States. Under such circumstances a military enterprise to be carried on from the United States exists within the meaning of the law.

84 F. Cas. at 612–14.

### III. Attorney General Opinions

As is the case with judicial decisions on the subject, the earliest opinions of Attorneys General construing the Neutrality Act distinguished between "commercial" and "hostile" intent for purposes of the prohibition, by the predecessors to §§ 961 and 962, on "outfitting vessels of war." *See, e.g.*, 2 Op. Att'y Gen. 86 (1828); 1 Op. Att'y Gen. 231 (1818); 1 Op. Att'y Gen. 190 (1816). Attorneys General have opined that the Act forbids furnishing ships of war in American ports with guns and other military equipment to be used by nations against nations with which the United States is at peace. *See, e.g.*, 5 Op. Att'y Gen. 92 (1849); 4 Op. Att'y Gen. 336 (1844); 3 Op. Att'y Gen. 739 (1841).

The predecessor to § 959 was construed by early Attorneys General to prohibit the recruitment or enlistment of persons for service on foreign vessels of war in American ports. *See* 4 Op. Att'y Gen. 336 (1844). This latter prohibition on enlistment was construed by Attorney General Cushing to prohibit the undertaking by belligerent nations to enlist troops in the United States, on the ground that such action constitutes a "gross national aggression on the United States and insults our national sovereignty," for which all, except those protected by diplomatic immunity, are punishable. 7 Op. Att'y Gen. 367, 382 (1855). Attorney General Cushing's lengthy opinion on foreign enlistment premises the statutory prohibition in § 959 on the notion that while a neutral state may permit a belligerent nation to raise troops on its soil, it should not grant such a concession to one belligerent and not to all. *Id.*

As early as 1795, Attorney General Bradford opined that the Neutrality Act did not preclude the commission of hostile acts by American citizens against Nations with which the United States is at peace as long as the potential defendants did not set foot from American soil. Regarding American citizens who, while trading on the coast of Africa, "voluntarily joined, conducted, aided, and abetted a French fleet in attacking" a British settlement on that coast, the Attorney General stated:

> [A]cts of hostility committed by American citizens against such as are in amity with us, being in violation of a treaty, and against the public peace, are offences against the United States, so far as they were committed within the territory or jurisdiction thereof; and, as such, are punishable by indictment in the district or circuit courts.
>
> \*　　　\*　　　\*
>
> So far . . . as the transactions complained of originated or took place in a foreign country, they are not within the cognizance of

213

> our courts; nor can the actors be legally prosecuted or punished
> for them by the United States.

1 Op. Att'y Gen. 57, 58 (1794). Pointing out that the Government's inability to prosecute under the Act resulted solely from § 960's requirement that the defendant have "set foot" from "within the United States," Attorney General Bradford noted that those "who have been injured by these acts of hostility have a remedy by a *civil* suit in the courts of the United States." *Id.* at 59.

In 1856, Attorney General Cushing distinguished between the mere "organization, in one country or state, of combinations to aid or abet rebellion in another, or in any other way to act on its political institutions," which is *not* prohibited by the Act, from overt "attempts to interfere in the affairs of foreign countries by force," which *is* unlawful. 8 Op. Att'y Gen. 216 (1856). *See also* 8 Op. Att'y Gen. 472 (1855). The activities of the former, which the Attorney General referred to as "Revolutionary Aid Societies," while "a violation of national amity and comity," are limited to "inflammatory agitation" and discussion, falling short of the unlawful enlistment and military expeditions prohibited by the Act. *Id.*

In 1869, Attorney General Hoar opined that the Neutrality Act was properly applicable only with respect to political entities recognized by the United States as an "independent government, entitled to admission into the family of nations":

> The statute of 1818 is sometimes spoken of as the *Neutrality Act*; and undoubtedly its principal object is to secure the performance of the duty of the United States, under the law of nations, as a neutral nation in respect to foreign powers . . . . The United States have not recognized the independent national existence of the island of Cuba, or any part thereof, and no sufficient reason has yet been shown to justify such a recognition. In the view of the Government of the United States, as a matter of fact, which must govern our conduct as a nation, the island of Cuba is territory under the government of Spain, and belonging to that nation.

> If ever the time shall come when it shall seem fitting to the political department of the Government of the United States to recognize Cuba as an independent government, entitled to admission into the family of nations, or, without recognizing its independence, to find that an organized government capable of carrying on war, and to be held responsible to other nations for the manner in which it carries it on, exists in that island, it will be the duty of that department to declare and act upon those facts.

> \*       \*       \*

> But, on the other hand, when a nation with which we are at peace, or the recognized government thereof, undertakes to

214

procure armed vessels for the purpose of enforcing its own recognized authority within its own dominions, although there may be evidence satisfactory to show that they will aid the government in the suppression of insurrection or rebellion, in a legal view this does not involve a design to commit hostilities against anybody.

*     *     *

The concession of belligerent rights to a "colony, district, or people" in a state of insurrection or revolution, necessarily involves serious restrictions upon the ordinary rights of the people of this country to carry on branches of manufacture and trade which are unrestricted in time of peace. To prevent our mechanics and merchants from building ships of war and selling them in the markets of the world, is an interference with their private rights which can only be justified on the ground of a paramount duty in our international relations; and however much we may sympathize with the efforts of any portion of the people of another country to resist what they consider oppression or to achieve independence, our duties are necessarily dependent upon the actual progress which they have made in reaching these objects.

13 Op. Att'y Gen. 177, 178, 180 (1869). Thus, he concluded, the Act did not prohibit the building of gunboats in New York to be sold to the Spanish government for possible use by that Government against the Cuban insurrectionists. Nor would § 962 of the Act prohibit the supplying of Cuban insurgents with men, arms and munitions of war. 13 Op. Att'y Gen. 541 (1841).[8] In 1895, Attorney General Harmon, having declared that "neither Spain nor any other country had recognized the Cuban insurgents as belligerents," 21 Op. Att'y Gen. 267, 269, opined:

The mere sale or shipment of arms and munitions of war by persons in the United States to persons in Cuba is not a violation of international law [nor of the neutrality laws], however strong a *suspicion* there may be that they are to be used in an insurrection against the Spanish government. The right of individuals in the United States to sell such articles and ship them to whoever may choose to buy has always been maintained.

---

[8] In a very succinct opinion, Attorney General Akerman emphasized that his opinion addressed *only* the predecessor to § 962, adding that the allegations "might be material in connection with other proof." 13 Op. Att'y Gen. 541. Depending upon the allegations, and whether the United States Government recognized the Cuban insurrectionists as a sufficiently distinct political body to constitute more than a domestic irritant to Spain's internal affairs, a colorable claim under § 960 could be made. *See, e g.*, 21 Op. Att'y Gen. 267, 269 (1896) ("International law takes no account of a mere insurrection, confined within the limits of a country, which has not been protracted or successful enough to secure for those engaged in it recognition as belligerents by their own government or by foreign governments.").

215

> If, however, the persons supplying or carrying arms and munitions from a place in the United States are in any wise parties to a design that force shall be employed against the Spanish authorities, or that, either in the United Sates or elsewhere, before final delivery of such arms and munitions, men with hostile purposes toward the Spanish Government shall also be taken on board and transported in furtherance of such purposes, the enterprise is not commercial, but military, and is in violation of international law and of our own statutes.

*Id.* at 270, 271 (emphasis added).

Further attempts to distinguish between "commercial" and "hostile" intent in trading with belligerents were made by Attorney General Knox in 1902. Responding to the Secretary of State's inquiry regarding the legality of shipping horses from New Orleans to South Africa, a belligerent, Attorney General Knox opined that although a neutral nation is prohibited by the general principles of international law from giving aid to one of the belligerents during a war, "carrying on commerce with the belligerent nation in the manner usual before the war is . . . agreed not to be in itself giving such aid." 24 Op. Att'y Gen. 15, 18 (1902). He added, however, that "the fact that neutral *individuals* instead of their government give aid to the belligerent does not relieve the neutral government from guilt," unless the acts are, by their nature, "impracticable or excessively burdensome for the government to watch or prevent." *Id.* Several days later, Attorney General Knox referred to this opinion and that of his predecessor, Attorney General Harmon, 21 Op. Att'y Gen. 267 (1895), in advising the Secretary of State that the shipping of arms to China, notwithstanding the presence of insurrectionary movements, would constitute a commercial venture and therefore not a violation of the Neutrality Act. 24 Op. Att'y Gen. 25 (1902).

Prior to the United State's engagement in World War II, Attorney General Murphy construed the Act to prohibit the transporting of any articles or materials from a United States port to a port of a belligerent nation, until all goods of United States citizens on board had been transferred to foreign ownership. *See* 39 Op. Att'y Gen. 391 (1939). Later that year, Attorney General Murphy opined that American trawlers and tugs which had been sold to French concerns could lawfully depart United States ports after assurances by the French government that the vessels were not intended to be employed to commit hostilities against another belligerent. 39 Op. Att'y Gen. 403 (1939).

Finally, Attorney General Jackson opined in 1940 that, while the United States Government could sell certain outdated American destroyers to the British Government during World War II, it was precluded by the predecessor to § 964 from selling to the British Government "mosquito boats" which were under construction by the United States Navy, "since . . . [the latter] would have been built, armed or equipped with the intent, or with reasonable cause to

believe, that they would enter the service of a belligerent after being sent out of the jurisdiction of the United States." 39 Op. Att'y Gen. 484, 496 (1940).[9] In distinguishing between the over age destroyers and the "mosquito boats" which were, at that time, under construction, Attorney General Jackson referred to the "traditional" rules of international law," which distinguish between the selling of previously armed and outfitted vessels to a belligerent, and the building of armed vessels "*to the order of a belligerent.*'" *Id.* at 495 (quoting 2 Oppenheim, *International Law* 574–76).

This distinction, regarding which Jackson cites Oppenheim's characterization as "'hair splitting,'" although "'logically correct,'" is premised upon the view that by "carrying out the order of a belligerent, [a neutral nation permits its] territory [to be] made the base of naval operations," in violation of a neutral's "duty of impartiality." *Id.* Because of the potential importance of this distinction and its subtleties, we set out below the text of Attorney General Jackson's lengthy quote from Oppenheim's treatise which explains the rationale of this view in greater detail.[10]

---

[9] We noted in our earlier memorandum that §§ 963 and 964, first enacted as part of the Espionage Act of 1917, 40 Stat. 221 22, codified the substantive rules of international law forbidding the delivery of armed vessels to belligerent powers by neutral nations. Regarding these provisions and Attorney General Jackson's opinion, we concluded that:

Although some commentators have suggested that Attorney General Jackson's opinion supports the view that all of the Neutrality Act provisions were intended to apply to Government activities, we believe that § 964 by its terms is limited to circumstances involving a declared war, unlike the other neutrality laws, and was proposed to Congress by Attorney General Gregory in 1917 for the purpose of providing "for the observance of obligations imperatively imposed by international law upon the United States." H R Rep. No. 30, 65th Cong., 1st Sess. 9 (1917).

8 Op. O.L.C. at 77 n.21. In 1941, however, Congress enacted the Lend Lease Act, 55 Stat. 31, which authorized the President to supply, with certain limitations, military equipment to the government of any nation the defense of which he deems vital to the defense of the United States. This Act, which granted temporary emergency powers to the President, effectively suspended the operation of the predecessor to § 964 until June 30, 1943 *See* S. Rep. No. 45, 77th Cong., 1st Sess. (1941); H.R. Rep. No 18, 77th Cong., 1st Sess. (1941). *See generally* 40 Op. Att'y Gen. 58 (1941).

[10] Attorney General Jackson quoted the following from 2 Oppenheim, *International Law* 574–76:

Whereas a neutral is in no wise obliged by his duty of impartiality to prevent his subjects from selling armed vessels to the belligerents, such armed vessels being merely contraband of war, a neutral is bound to employ the means at his disposal to prevent his subjects from building, fitting out, or arming, to the order of either belligerent, vessels intended to be used as men of war, and to prevent the departure from his jurisdiction of any vessel which, by order of either belligerent, has been adopted to warlike use. The difference between selling armed vessels to belligerents and building them to order is usually defined in the following way.

An armed ship, being contraband of war, is in no wise different from other kinds of contraband, provided that she is not manned in a neutral port, so that she can commit hostilities at once after having reached the open sea. A subject of a neutral who builds an armed ship, or arms a merchantmen, not to the order of a belligerent, but intending to sell her to a belligerent, does not differ from a manufacturer of arms who intends to sell them to a belligerent. There is nothing to prevent a neutral from allowing his subjects to sell armed vessels, and to deliver them to belligerents, either in a neutral port or in a belligerent port.

\*         \*         \*

On the other hand, if a subject of a neutral builds armed ships to the order of a belligerent, he prepares the means of naval operations, since the ships, on sailing outside the neutral territorial waters and taking in a crew and ammunition, can at once commit hostilities. Thus, through the carrying out of the order of the belligerent, the neutral territory has been made the base of naval operations; and as the duty of impartiality includes an obligation to prevent either belligerent

Continued

217

A more recent statement by an Attorney General construing the Neutrality Act is found in a press conference held on April 20, 1961, by Attorney General Kennedy, following the Bay of Pigs invasion. Although Attorney General Kennedy did not formally opine on this matter, the views presented in this press conference have been widely quoted as the views of the Kennedy Administration on the Act:

> First . . . the neutrality laws are among the oldest laws in our statute books. Most of the provisions date from the first years of our independence and, with only minor revisions, have continued in force since the 18th Century. Clearly they were not designed for the kind of situation which exists in the world today.
>
> Second, the neutrality laws were never designed to prevent individuals from leaving the United States to fight for a cause in which they believed. There is nothing in the neutrality laws which prevents refugees from Cuba from returning to that country to engage in the fight for freedom. Nor is an individual prohibited from departing from the United States, with others of like belief, to join still others in a second country for an expedition against a third country.
>
> There is nothing criminal in an individual leaving the United States with the intent of joining an insurgent group. There is nothing criminal in his urging others to do so. There is nothing criminal in several persons departing at the same time. What the law does prohibit is a group organized as a military expedition from departing from the United States to take action as a military force against a nation with whom the United States is at peace.
>
> There are also provisions of early origin forbidding foreign states to recruit mercenaries in this country. It is doubtful whether any of the activities presently engaged in by Cuban patriots would fall within the provisions of this law.

11 M. Whiteman, *Digest of International Law* 231 (1968). *See also* Lobel, *The Rise and Decline of the Neutrality Act: Sovereignty and Congressional War Powers in United States Foreign Policy*, 24 Harv. Int. L.J. 1, 4 & n.16 (1983); N.Y. Times, Apr. 21, 1961, § 1 at 6.

---

[10] (. . . continued)
from making neutral territory the base of military or naval operations, a neutral violates his neutrality by not preventing his subjects from carrying out an order of a belligerent for the building and fitting out of men of war. This distinction, although of course logically correct, is hair splitting. But as, according to the present law, neutral States need not prevent their subjects

## Conclusion

We have attempted to provide a broad overview of the Neutrality Act, its various provisions, their scope, and their application, by courts and Attorneys General throughout their history since their original enactment in 1794. Together with our recent memorandum to you, this memorandum should provide you with a survey of the most prominent authorities relative to these provisions of criminal law. However, herein we have not attempted to provide a definitive analysis of the applicability of these provisions to any specific set of facts, and this memorandum should not be construed as such.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*